**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**KIEKHAEFER CORPORATION, Respondent.**

**No. 13167.**

United States Court of Appeals
Seventh Circuit.

June 29, 1961.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allan I. Mendelsohn, Atty., National Labor Relations Board, Washington, D. C., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Attys., National Labor Relations Board, Washington, D. C., for petitioner.

James I. Poole, Richard L. Harrington, John H. Jackson, George Maly, Jr., Milwaukee, Wis., for respondent, Foley, Sammond & Lardner, Milwaukee, Wis., of counsel.

Before SCHNACKENBERG and CASTLE, Circuit Judges, and GRUBB, District Judge.

CASTLE, Circuit Judge.

This case is before the Court on the petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended (29 U.S.C.A. § 160(e)) for enforcement of the Board's order issued against Kiekhaefer Corporation, respondent.

The Board's decision and order followed proceedings under the Act [1] which culminated in findings that respondent violated Section 8(a) (1), (2) and (3).[2]

---

1. National Labor Relations Act, as amended. Hereafter referred to as the Act.

2. 29 U.S.C.A. § 158, which, in so far as pertinent, provides:
   "(a) It shall be an unfair labor practice for an employer—

   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   "(2) to dominate or interfere with the formation or administration of any labor

The Board found that respondent violated Section 8(a) (3) by engaging in acts of reprisal against employees who were seeking to disaffiliate from Kiekhaefer Independent Workers Association (KIWA) and affiliate with International Association of Machinists (IAM). These included a reduction in employee working hours, layoffs, and the transfer of an employee. The Board further found that by such conduct, as well as by threats of reprisal, the withdrawal of employee privileges, and the promulgation of an unlawful no-solicitation rule, respondent interfered with, restrained and coerced employees in violation of Section 8(a) (1). The Board concluded that this entire course of conduct constituted assistance and support to KIWA in violation of Section 8(a) (2) and (1).

The Board's order requires respondent to cease and desist from the unfair labor practices found. Affirmatively, it directs respondent to make whole, for any loss of earnings, the employees who were reduced in working time, laid-off or transferred. In addition, the order requires respondent to withdraw recognition from KIWA as the representative of its employees and to cease giving further effect to the current collective bargaining agreement with KIWA, or any extensions or renewals thereof, unless and until respondent's employees have demonstrated their choice of majority representative pursuant to a Board-conducted election.

The main contested issues presented for our determination are:

(1) Whether substantial evidence, on the record considered as a whole, supports the Board's finding that respondent violated Section 8(a) (3) and (1) of the Act by making reprisals and threats thereof to discourage employee adherence to IAM.

(2) Whether such substantial evidence supports the finding that respondent violated Section 8(a) (2) of the Act.

(3) Whether, if the Board's finding and conclusion that KIWA was assisted and supported in violation of Section 8(a) (2) and (1) is so supported, the Board's order in so far as it requires withdrawal of recognition of KIWA as the employees' representative and that no further effect be given the collective bargaining agreement executed with KIWA, or any extension or renewal thereof, unless and until KIWA shall have been newly certified as majority representative of the employees, is authorized and proper.

Contentions advanced by respondent relating to additional questions include whether respondent was denied a fair hearing, whether the complaint contained allegations not supported by a timely charge, and whether motions for production of statements of witnesses to the General Counsel were erroneously denied.

■ We have carefully reviewed the record, the intermediate report of the trial examiner, and the decision and order of the Board. Our review in so far as the factual findings of the Board are concerned is limited to a determination of whether or not those findings are supported by substantial evidence on the record considered as a whole. Board findings so supported are conclusive. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456. With that rule in mind the facts and circumstances upon which the Board's findings are based may be summarized as follows:

■ In August, 1957, the Board conducted a representation election among the respondent's production and maintenance employees at its Cedarburg, Wisconsin, plants. IAM and KIWA appeared on the ballot, the latter receiving a majority of the votes cast. The election was set aside because of respondent's interference with the employees' free

organization or contribute financial or other support to it; * * *
(3) by discrimination in regard to hire or tenure of employment or any term or

condition of employment to encourage or discourage membership in any labor organization: * * *."

choice by making economic concessions to KIWA shortly before the election and by favoring KIWA in the enforcement of a no-solicitation rule. At a subsequent Board-conducted election KIWA again polled a majority of the votes and was certified May 21, 1958 as the exclusive representative of respondent's employees at the Cedarburg plants. The validity of this election is not assailed.

Respondent and KIWA held several collective bargaining sessions between May and mid-September 1958. Respondent's highest wage offer during that period was a proposed hourly increase of 3¢ for incentive workers and 5¢ for non-incentive workers. At a KIWA meeting on September 16 the employees voted to reject this offer. As a result of their dissatisfaction with the progress of negotiations, the employees, at this same meeting, instructed KIWA president Owen to call a special meeting on or before October 6, for a vote on a change in affiliation from KIWA to IAM. The meeting was called for September 29 and a notice thereof posted in the plants and sent to respondent's president, Lohmann. Lohmann then sent a letter to the employees referring to the forthcoming vote, stating, *inter alia,* that absent "a basis of teamwork between ourselves * * * we cannot continue to take the responsibility of operating this business" and "the lack of a vote of confidence * * * will necessarily curtail further expansion * * has caused us not to accept orders" and "without a vote of confidence in the company, there certainly will be no tomorrow. Take your choice." The letter concluded, "For the sake of your jobs, your children and your community, why vote for an outside organization that never has, and never will have any part in the building of this business or your job, Vote KIWA".

At about this same time respondent's supervisors Abel, Brubaker and Schiller, in separate conversations with employee Morganroth, vice president of KIWA, stated that if the employees voted for IAM, "there would probably be a cut back in work", that "new work would be sent out", and that there "would probably [be] even a moving of the plant". Kaiser, who was in charge of employee relations for respondent, told Morganroth that if the employees joined a national organization, the plant could be moved south, "where labor is cheap". Foreman Schiller told employee Hopfensperger that "if IAM gets in, we are going to move the plant to Texas".

The production and maintenance unit of the two plants consists of approximately 760 employees. About 500 employees attended the September 29 meeting and a majority [3] voted by secret ballot to disaffiliate from KIWA and affiliate with IAM. The following day Owen met with Lohmann, so informed him and requested that respondent bargain with IAM. Lohmann refused on the ground that KIWA had been certified by the Board. On September 30 Owen advised Lohmann by letter that the officers and bargaining committee for the newly formed IAM, Mercury Lodge 20, were identical to those formerly representing KIWA and "will be pleased to continue negotiating a contract with your company." On October 13 respondent by a plant bulletin announced that it would continue to negotiate with KIWA.

Prior to the issuance of the bulletin respondent permitted employees, during working hours, to circulate through the plant and collect the signatures of a majority of the employees on certain petitions that KIWA continue to be the representative for bargaining purposes. These petitions, together with the fact of KIWA's certification, formed the basis for respondent's continued refusal to deal with the IAM lodge. A new executive board and bargaining committee were established by KIWA and on November 1 respondent executed a two-year contract with KIWA which contained an hourly wage increase of 5¢ for incentive workers and 10¢ for non-incentive workers and a new supplementary shutdown-

3. The record does not disclose the precise vote but there is testimony that 425 ballots were cast.

time payment and vacation allowance for incentive employees.

Lohmann had been a company official since 1948 and could recall no lay-off of tool-room employees. But the day after the vote on disaffiliation tool-room hours which generally were over 50 hours weekly were cut to 40 hours weekly. The following week they were cut to 32, and it was not until two weeks later, after several employees had been laid-off, that a 40 hour week was re-established. Employees Hahn and Morganroth were among those affected by the reduction of hours. Morganroth had become vice-president of IAM. Hahn, an IAM adherent, had previously been told by foreman Abel, when he requested a raise, that he would never get any more money because "you have been sticking up for the IAM" and "have been on the wrong side of the fence". Hahn asked foreman Schiller why the tool-room hours had been cut and was advised, "We warned you what would happen if you joined an international union. * * * This is all you guys fault in the tool-room, you have to take the consequences".

Hopfensperger, another tool-room employee, was laid-off. The reason given was "shortage of work" but the particular machine he was employed to operate continued to be operated by two apprentices. When he had earlier inquired of foreman Schiller as to why the hours had been cut he was told that because of the vote on disaffiliation "they were shipping the work out" and reminded that he had been told this would happen. Schoen, whose work had never been criticized, but who had worn an IAM button on the job, was also laid-off from the tool-room. On the day after he advised Lohmann of the vote on disaffiliation, Owen was transferred from his job as finish painter to that of a prime painter. Although neither his rate of pay nor classification was changed, the transfer resulted in a decrease in gross earnings.

A few days after the vote on disaffiliation the employees' privilege of using the company parking lot was revoked. The reason given was that articles had been stolen from the plant "under cover of darkness" and placed in a car parked in the lot. But, in this connection, Foreman Schiller told an employee, "We warned you what would happen if you joined an international union."

Employees had been permitted to attend KIWA meetings during working hours and make up the time so lost from their jobs. Hunt an employee who had done this asked his foreman on October 21 whether he could attend a scheduled IAM meeting. The foreman, Bath, replied that he would find out and later told Hunt and another employee that they "would be able to go, but we should take our lunch buckets because we wouldn't be allowed to come back into work that night". The following day Bath handed Hunt a letter stating that Hunt had "walked off" the job without permission and that if this were to reoccur, "it will be cause for disciplinary action".

On January 21, 1959, Lohmann posted a notice on the plant bulletin board stating, in part, that participation in organizational activities of any kind on company time or property is prohibited. In May 1959, the words "or property" were deleted.

Although the charges filed included a charge that the respondent sponsored and dominated KIWA, the complaint issued by General Counsel alleges only assistance and support of KIWA. At the hearing, over respondent's objection, the complaint was amended to include the "discharge" of Hopfensperger.

From our study of the record we are convinced, as was the Board, that the respondent's conduct, as summarized herein, constituted violations of the Act as found by the Board. In those instances where conflict in the testimony appears the trial examiner based his findings on the witnesses he deemed credible. And, viewed as a whole, and with due regard for such conflicts as may exist, the record supports the Board's findings with substantial evidence.

■ We have considered the contentions of respondent relating to denial

of a fair hearing but find them not persuasive. The formal amendment complained of related to a charge timely made. Where the Board's jurisdiction has been invoked by the filing of a charge, the Board is empowered to deal with unfair labor practices "which are related to those alleged in the charge * * *." National Licorice Co. v. N. L. R. B., 309 U.S. 350, 369, 60 S.Ct. 569, 579, 84 L.Ed. 799. This is particularly true where, as here, the discrimination against Hopfensperger, was "of the same class of violations as those set up in the charge and were continuations of them in pursuance of the same objects." Ibid. Nor was respondent prejudiced by the proof of "lay-offs" under a charge and allegation of "discharges". And the resolving of issues of credibility against respondent does not alone establish bias on the part of the trial examiner. N. L. R. B. v. Pittsburgh S. S. Co., 337 U.S. 656, 659–660, 69 S.Ct. 1283, 93 L.Ed. 1602. Nor do we regard the terminology and language used by the trial examiner in his Intermediate Report to characterize respondent's conduct such as would supply factors lacking to establish bias.

The record shows that counsel for respondent, during the course of cross-examination of one of General Counsel's witnesses, requested and was permitted to examine the pre-trial statement the witness had made to General Counsel. It was not prejudicial error to deny him access to the statement again while cross-examining another witness. The second request was not within the doctrine of Jenks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, nor within the purview of the Board's rule designed to make similar procedure applicable in Board proceedings.

We have considered all other contentions of respondent relating to the findings of the Board and find its contentions without merit.

We turn now to consideration of the objections urged against that portion of the Board's order which requires respondent to withdraw recognition of KIWA as the bargaining representative of its employees and that no further effect be given the agreement executed with KIWA unless and until KIWA is newly certified following a Board-conducted election. The complaint did not allege and there was no finding that KIWA was employer sponsored or dominated. It did allege, and the Board properly found, that KIWA was supported and assisted by respondent. That the acts of support or assistance occurred during a period when KIWA was the Board certified exclusive representative of respondent's employees does not insulate such acts from the prohibitions of Section 8(a) (2) and (1) of the Act. N. L. R. B. v. Wagner Iron Works, Etc., 7 Cir., 220 F.2d 126, 138, certiorari denied 350 U.S. 981, 76 S.Ct. 466, 100 L. Ed. 850. They were violations of the Act and it was proper for the Board to order that the respondent cease and desist from engaging in such actions.

But it was respondent's duty under the Board's certification and the law to recognize KIWA and bargain with it. This is particularly so during the one-year period following certification. Cf. Brooks v. N. L. R. B., 348 U. S. 96, 99, 75 S.Ct. 176, 99 L.Ed. 125. The Board concedes that its certification of KIWA would ordinarily be immune from challenge for one year.

The obligation imposed upon an employer by Section 8(a) (5) of the Act to bargain with a union certified by the Board as the employees' majority representative may not, of course, be used as a justification for conduct unlawful under Section 8(a) (2). To permit such defense would nullify Section 8(a) (2) once a majority of the employees had chosen a collective bargaining representative. But recognition of this principle does not require that the duty of the Board to prevent unfair labor practices be regarded as authorizing or justifying Board action which rather than effectuating the primary

purpose of the Act is an unstabilizing factor. The primary objective of Congress in enacting the National Labor Relations Act was to achieve stability of labor relations. Colgate-Palmolive-Peet Co. v. N. L. R. B., 338 U.S. 355, 362, 70 S.Ct. 166, 181, 94 L.Ed. 161. In Brooks it was said at p. 103:

> "The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. Congress has devised a formal mode for the selection and rejection of bargaining agents and has fixed the spacing of elections, with a view of furthering industrial stability and with due regard to administrative prudence."

In N. L. R. B. v. Scullin Steel Co., 8 Cir., 161 F.2d 143, 147, the court in refusing to enforce that portion of a Board order which, as here, directed withdrawal of recognition of the Board certified bargaining representative and abrogation of the collective bargaining agreement executed with such union, unless and until it was newly certified, pointedly observed:

> "The Board, under Section 10 of the Act, 29 U.S.C.A. § 160, had power to require an offending employer 'to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies' of the Act. This power is not, however, unlimited. The Board is not authorized to break some other law as a means of enforcing the provisions of this act. Southern Steamship Co. v. N. L. R. B., 316 U.S. 31, 62 S.Ct. 100, 86 L.Ed. 479; N. L. R. B. v. Fansteel Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Consolidated Edison Co. v. N. L. R. B., supra [306 U.S. 197, 59 S.Ct. 219, 83 L.Ed. 126]. Here the

Board violates the contract of agency entered into by competent parties for a lawful purpose. The employees had the right to designate Independent as their bargaining agent. The Board issued its certificate and it became incumbent upon respondent to recognize Independent as the representative of its employees. Valley Mould & Iron Corporation v. N. L. R. B., 7 Cir., 116 F.2d 760. If there were doubt as to whether Independent remained the choice of the employees the Board had authority to settle that question by requiring an election, but this it did not do. In Consolidated Edison Co. v. N. L. R. B., supra [306 U.S. 197, 59 S.Ct. 219], the Supreme Court considered an order of the Labor Board which in effect invalidated contracts entered into between the representative of the employees and the employer. Observing that the Act gave no express authority to the Board to invalidate contracts with independent labor organizations and that the authority, if it existed, must rest upon the provisions of Section 10(c), which authorizes the Board to take such affirmative action as will effectuate the policies of the Act, the court said: 'We think that this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.'

> "In the Edison case, as in the case at bar, the union was not dominated by the employer. The court further said:

> "'Here, there is no basis for a finding that the contracts with the Brotherhood and its locals were a consequence of the unfair labor practices found by the Board or that these contracts in themselves thwart

any policy of the Act or that their cancellation would in any way make the order to cease the specified practices any more effective.

" 'The Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining. Under Section 7 the employees of the companies are entitled to self-organization, to join labor organizations and to bargain collectively through representatives of their own choosing. The 80 per cent of the employees who were members of the Brotherhood and its locals, had that right. They had the right to choose the Brotherhood as their representative for collective bargaining and to have contracts made as the result of that bargaining. * * *

" 'We conclude that the Board was without authority to require the petitioning companies to desist from giving effect to the Brotherhood contracts, as provided in subdivision (f) of paragraph one of the Board's order.' "

And, this is not a case where presentation of a rival or conflicting claim raised a real question concerning representation. Shortly after the vote on disaffiliation respondent was confronted with petitions signed by a majority of its employees that KIWA continue to be their representative. Thereafter, when the contract with KIWA was executed, no question concerning representation existed. The respondent was under a duty to bargain with KIWA and execute a contract with it if agreement was reached. Cleaver-Brooks Mfg. Corp. v. N. L. R. B., 7 Cir., 264 F.2d 637, certiorari denied 361 U.S. 817, 80 S.Ct. 58, 4 L.Ed.2d 63; N. L. R. B. v. Indianapolis Newspapers, Inc., 7 Cir., 210 F.2d 501.

The Board's discretionary authority to fashion remedies to purge unfair labor practices necessarily has a broad reach but is circumscribed by the requirement that the remedy shall be appropriate and be adapted to the situation which calls for redress. The remedy may not be oppressive or punitive as applied to the circumstances rather than calculated to effectuate a policy of the Act. N. L. R. B. v. District 50, U. M.W., 355 U.S. 453, 458, 78 S.Ct. 386, 2 L.Ed.2d 401.

Under the facts and circumstances disclosed by the record in this case it is our opinion that the Board was without authority to direct withdrawal of recognition of KIWA and abrogation of the contract with it unless and until it was newly certified. The order will be modified by deleting such provisions (1(a), 1(b) and 2(a) ). As so modified the order will be enforced.

Enforcement of order as modified ordered.