**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**APPLETON ELECTRIC COMPANY, et al., Respondents and Local 1031, International Brotherhood of Electrical Workers, Intervenor-Respondent.**

**No. 13244.**

United States Court of Appeals Seventh Circuit.

Nov. 15, 1961.

As Amended Nov. 27, 1961.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Standau E. Weinbrecht, Attorney, N. L. R. B., Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Melvin J. Welles, Attorney, N. L. R. B., Washington, D. C., for petitioner.

Jay A. Canel, Leonard A. Canel, Chicago, Ill., for respondents.

Mozart G. Ratner, Joseph L. Sax, Washington, D. C., for intervenor.

Before HASTINGS, Chief Judge, and DUFFY and CASTLE, Circuit Judges.

DUFFY, Circuit Judge.

This is an unfair labor practices case and is here upon petition of the Labor Board for enforcement of an order issued April 16, 1958, reaffirmed June 24,

1960, and amended January 16, 1961. The Board's Decision and Order in the unfair labor proceeding is reported at 120 NLRB 451. The Board's Supplemental Decision and Order, ruling on an issue considered after further hearing, is reported at 127 NLRB No. 173. Its Second Supplemental Decision and Amendment of the Order is reported at 129 NL RB No. 168. The Board divided three to two in holding that respondent Appleton unlawfully assisted International Brotherhood of Electrical Workers (IBEW), Local 1031, within the meaning of sec. 8(a) (2) of the Act, 29 U.S.C.A. § 158(a) (2).

Prior to 1952, Appleton Electric Company (Appleton) purchased the raw malleable castings used in the production of its electrical fixtures from Wisconsin Appleton Company, a foundry located in South Milwaukee, Wisconsin. The Appleton family held a controlling stock interest in this company. In July 1952, the assets of Wisconsin Appleton were transferred to Chicago Appleton; the former corporation was dissolved and its physical facilities were established as the South Milwaukee Foundry Division of Appleton. It continued to produce raw malleable castings which were sent to Appleton in Chicago for machining and shipping.

Prior to the transfer of the assets of Wisconsin Appleton to Appleton in July 1952, Appleton offered IBEW an opportunity to represent the employees in the Wisconsin Appleton foundry. IBEW declined because of the distance of the foundry from Chicago. Since 1952, as before, the employees in that foundry have been represented as a separate bargaining unit by International Molders and Foundry Workers Union.

On June 12, 1945, the Board certified an IBEW sister local as exclusive bargaining agent of the employees of Appleton. In 1947, Appleton purchased the assets of Goodrich Electric Company, including its plant on Belle Plaine Avenue in Chicago, about four miles distant from the Appleton plant. This plant became Appleton's lighting division. The lighting fixtures are there produced and then shipped to the main Appleton factory for finishing, packing and shipping. From the time Appleton acquired Goodrich, employees in the lighting division were treated by Appleton and IBEW as part of the original unit, and the contracts between Appleton and IBEW were applied to them. However, seniority rights were established on plantwide basis only.

In 1953, District No. 8, IAM filed with the Board a petition for election among all production and maintenance employees of Appleton in its plants in the Chicago area. The Board dismissed the petition holding that the May 5, 1952 agreement between Appleton and IBEW as automatically renewed on February 2, 1953, was a bar. No petition seeking representation of any portion of the Chicago area unit has since been filed with the Board.

On September 1, 1954, Local 1031, IBEW was admittedly the exclusive bargaining agent of an appropriate bargaining unit consisting of all production and maintenance employees employed by Appleton in its plant in the Chicago area. The Union Shop contract between Local 1031 and Appleton executed that day, defined the Unit as including the existing plants in that area and "any future plants or divisions located in the Greater Chicago Metropolitan Area."

On September 1, 1954, the expiration date of the 1953 contract, and prior to the time Appleton was aware that the assets of Illinois Malleable were available for purchase, Appleton entered into a new contract with Local 1031, which contract was to expire on September 1, 1956.

Between September 8 and 10, 1954, Appleton learned the properties of Illinois Malleable Iron Company (Malleable) were for sale. The factory facilities of Malleable were immediately adjacent to those of Appleton, being separated only by a railroad track. On September 21, 1954, Appleton Profit Sharing Plan purchased the real property of Malleable and leased it to Appleton. Appleton purchased substantially all of Malleable's

stock. Because a tax loss by Malleable could be used, Appleton's attorney advised that the corporate structure of Malleable be retained and this was done. However, all of the directors of Malleable resigned and Appleton directors were elected to replace them.

Immediately upon the purchase of Malleable by Appleton, Attorney Canel, then counsel for Appleton, informed M. F. Darling, President and Business Manager of Local 1031, of the purchase. Canel informed Darling of the proposed plan of operation of the acquired plant. Canel expressed the opinion that the contract between Appleton and Local 1031 executed September 1, 1954, would cover all of the employees hired by Appleton for Malleable. Darling agreed that under the "Future Plants and Division" clause, the employees hired by Appleton for Malleable would become part of the bargaining unit of Local 1031.

Darling stated, however, that inasmuch as Malleable would be a separate corporation, a supplemental agreement would be desirable to show that Malleable was a part of Appleton, to provide for new job classifications and wage rates, and if Appleton should hire former employees of Malleable, to provide for granting extra seniority credits for vacation purposes to those employees in recognition of their former service, as had been done when Appleton acquired the Goodrich lighting division. Canel agreed, and a supplemental agreement was executed on September 22, 1954.

As soon as employees were hired for Malleable, Local 1031 appointed stewards for the Malleable plant to serve under the Appleton Chief Steward who was in charge of the stewards for all divisions and departments in the Chicago area unit. Malleable employees presented their grievances through Local 1031 stewards. Later, the Malleable employees elected their own Local 1031 stewards by secret ballot. From the very outset, Local 1031 treated the new employees as equal members of the existing bargaining unit. It integrated them into the Chicago area bargaining and grievance structure.

After the acquisition of Malleable, the first unit-wide negotiations were held in 1956. Four representatives of Malleable employees were members of Local 1031 negotiating committee. The contract of September 1, 1956, was the result of such negotiations. Thereafter, there was a favorable ratification vote by the employees at both Appleton and Malleable.

All of Appleton's Chicago employees including those at the former Malleable plant are under centralized control with respect to both production and labor relations. There was only one employer and that was Appleton. The foundry and other operations at the former Malleable plant have been integrated with Appleton's other Chicago plants. Virtually the entire production of the former Malleable plant is utilized by the other Appleton plants. The new employees number only 142 as compared with more than 1000 in Appleton's other Chicago operations.

Prior to the shut-down of the plant, and since 1940, the employees of Malleable had been represented by United Automobile Workers (UAW). Stanley Solak, former personnel employment manager for Malleable, was made responsible for the selection of former Malleable employees to be hired by Appleton. He showed prospective employees a copy of the contract between Appleton and IB EW, and explained that Appleton employees would be required to join IBEW which was their representative under the "All Future Plants" clause of the contract. Solak also obtained dues check-off authorizations from the new employees. There was testimony that Solak told one prospective employee, Frank Thomas, that Appleton did not want any part of the CIO.

Raymond Smith, former chief UAW plant steward, applied for employment by Appleton. He claims Foreman Raiman told him, "If we rehire you we probably won't have this union (IBEW) and we will have the CIO." and that "They

would close the plant before they would accept the CIO." Smith was not hired.

The Board found that the operation undertaken at the Malleable plant was essentially a new enterprise for Appleton and employees hired for it did not constitute an accretion to the unit which was represented by IBEW.[1]

The Board ordered Appleton to cease and refrain from recognizing Local 1031 as bargaining agent for the former employees of Malleable until it is so certified. Also, to cease giving effect to contracts with Local 1031 and to cease requiring employees to become or remain members of that Local. The Board ordered Appleton to refund to all employees and former employees of Malleable, checked-off membership dues or other moneys paid to Local 1031.

■ The Board argues this case as though it were a representation case designed to determine prospective rights and obligations, but the issue before us is to determine the lawfulness or unlawfulness of Appleton's past conduct.

Appleton proposed to hire about 142 employees to operate the idle plant which, on September 21, 1954, it had added to its existing Chicago operations. Appleton had nearly seven times that number of employees in its other Chicago area plants, and all of these employees were in a single collective bargaining unit represented by IBEW and covered by a lawful union-security agreement.

■ Congress gave to a union selected by a majority in an appropriate unit the right to obtain recognition for the entire unit including a non-consenting minority. United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed 941; International Ladies' Garment Workers' Union, AFL-CIO v. N. L. R. B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762. For the protection of minorities, it granted them the right to seek separate representation by filing a petition under sec. 9(c) of the Act, 29 U.S.C.A. § 159(c). This scheme adopted by Congress " * * cannot be defeated by the Board's policy, which would make an unfair labor practice out of that which is authorized by the Act." Colgate-Palmolive-Peet Co. v. N. L. R. B., 338 U.S. 355, 363, 70 S.Ct. 166, 171, 94 L.Ed. 161.

■ It is apparent that this statutory scheme does afford the incumbent union an advantage over potential rivals but in the absence of a real question of representation such as in the case at bar, the Board may not lawfully dissipate that advantage. Local 357, Intern. Broth. of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 675–676, 81 S.Ct. 835, 6 L.Ed.2d 11.

To prohibit the inclusion of non-consenting minorities in the first instance in an appropriate larger unit before a question of representation has been raised, is to refashion the statutory scheme.

■ The Board's attempt to make illegal the inclusion of prospective employees of after-acquired plants and divisions would seem to be contrary to a basic policy of the Act, to-wit: to achieve stability of labor relations. N. L. R. B. v. Kiekhaefer Corp., 7 Cir., 292 F.2d 130.

Furthermore, the Board's policy overlooks the best interests of the new minority group. It would deprive them of representation at the most crucial period of their employment history, it being the time when wage rates are fixed, job classifications established and other working conditions determined by the employer.

■ We have here an appropriate unit. In addition, the union-security contract with Appleton was a valid contract. Of course, the Board has no power to reform the contract directly nor by indirection through the provisions of an order of the Board.

Neither the dues reimbursement remedy nor the Board's sweeping order can stand in the face of employees participat-

1. It was on this point that Chairman Leedum and member Bean dissented, resulting in a vote of 3 to 2.

ing in a contract negotiated in good faith with an undominated union.

We think member Bean well stated the situation confronting Appleton when he said in his dissenting opinion, " * * * Moreover, the agreement expressly provided that it should extend to plants thereafter acquired in the Chicago area. Appleton was thus faced with the alternative of applying, or refusing to apply, the agreement to the small group of new employees. It chose the alternative of honoring the agreement—a choice it made in good faith so far as the record shows. Accordingly, it required the new employees to comply with lawful union-security provisions of the agreement."

The enforcement of paragraphs 1(a), (b) and (c) and 2(a) and (d) of the Board's order will be denied.

■ The trial examiner found that the record did not establish that Appleton discriminatorily refused to employ Smith, Castelluccio and Hill in violation of sec. 8(a) (3) of the Act. The Board disagreed as to Smith and Castelluccio and held specifically that " * * * Smith and Castelluccio were denied employment solely because of their UAW activities and the Respondents' animus to that organization." More than two and a half years later, the Board, *sua sponte,* eliminated any reference to Castelluccio so the order, as revised, leaves standing only the finding and decision as to Smith.

Appleton argues the Board's findings as to Smith are predicated on the view that Appleton had no right to advise applicants for employment that they would be covered by the IBEW contract. Also, that the statements of its employees Solak and Neal were not unlawful threats of reprisal but privileged statements of legal position.

The Board says that Smith was discriminated against because a number of former employees whose jobs had been abolished were hired for jobs which they could perform. But the Board neglected to point out that two-thirds of Malleable's former complement of 650 men were not offered jobs. The Board also says that

Smith was highly experienced in the galvanizing department, but the record shows the "sal sprinkler's job" was abolished and that this was the only job Smith "formerly did" for Malleable.

The trial examiner found it impossible to draw the necessary inference that Smith's connection with UAW had something to do with his non-employment. We think the trial examiner was right. We hold that 2(b) and 2(c) of the Board's order should not be enforced.

Another point in dispute between the Board and Appleton is the latter's argument that the International Union (UAW) was not in compliance with the requirements of sec. 9(h) of the Act. This section establishes as a condition precedent to the utilization of the facilities of the Board by a labor organization, the requirement that there be on file with the Board, a non-Communist affidavit executed within the preceding 12 months by " * * * each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit * * *."

■ Respondent asserted two deficiencies in the Union's compliance, 1) the members of the International Board of Trustees were officers of the International Union but had not filed affidavits, and 2) that the foundry department of the International was a separate labor organization with which the charging party was affiliated, and its officers had not filed the required affidavits.

The Board held the International Trustees are not officers. We agree. The Board also held the Foundry-Department of the International Union is not a labor organization. Again, we agree.

■ The deletion of the portions of the Board's order which we have indicated will not be enforced, leaves the balance of the order with little substance. We think the practical way to handle the situation is to decree that the petition for enforcement of the Board's order be

Denied.