429 F.2d 1352
 SHERATON-KAUAI CORPORATION, Petitioner-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Petitioner.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HOTEL, RESTAURANT EMPLOYEES AND BARTENDERS UNION, LOCAL 5, AFL-CIO, Respondent.
 No. 24665.
 No. 24825.
 United States Court of Appeals, Ninth Circuit.
 July 23, 1970.
 
 Ernest C. Moore, Jr. (argued), Robert S. Katz, of Moore, Torkildson & Schulze, Honolulu, Hawaii, for Sheraton-Kauai Corp.
 Marcel Mallet-Prevost (argued), Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Roy O. Hoffman, Reg. Director, N.L. R.B., San Francisco, Cal., Dennis R. MacCarthy, Officer-In-Charge, Honolulu, Hawaii, for N.L.R.B.
 Rogers M. Ikenaga (argued), Ikenaga & Tam, Moore, Torkildson & Schulze, Bouslog & Symonds; Honolulu, Hawaii, for Union.
 Before JERTBERG, BROWNING, and HUFSTEDLER, Circuit Judges.
 BROWNING, Circuit Judge:
 
 
 1
 Sheraton-Kauai Corporation and Hotel, Restaurant Employees and Bartenders Union, Local 5, AFL-CIO, seek review of a National Labor Relations Board unfair labor practice decision and order. The Board cross-petitions for enforcement.
 
 
 2
 Sheraton Corporation of America operates a number of hotels in the State of Hawaii through wholly owned subsidiaries. In 1967 three of these subsidiaries entered into a collective bargaining agreement with Local 5. The agreement purported to cover all workers in relevant categories then employed at Sheraton hotels in the State of Hawaii, or at any Hawaii hotel thereafter operated by Sheraton, and included a clause requiring covered employees to join Local 5 within 31 days of their employment. When the agreement was entered into, Sheraton subsidiaries operated four hotels on the Island of Oahu and one on the Island of Maui. Sheraton-Kauai was later formed to build and operate a hotel on the Island of Kauai. When the new hotel opened, the company and the union extended the prior agreement, including the union security clause, to its employees. The Board found that in doing so the company violated sections 8(a) (1), (2), and (3) of the National Labor Relations Act (29 U.S.C. § 158(a) (1), (2), and (3)), and the union violated sections 8(b) (1) (A) and 8(b) (2) of the Act (29 U.S.C. § 158(b) (1) (A) and (b) (2).[1]
 
 
 3
 Sheraton-Kauai and Local 5 justify extension of the agreement to employees at the new hotel on alternative grounds, contending that the new employees were lawfully added to a state-wide bargaining unit without their consent under the doctrine of "accretion";[2] and that, in any event, an uncoerced majority of the new employees expressed their wish to be represented by Local 5.
 
 
 4
 The Board found that either a state-wide unit of Sheraton employees or a local unit consisting entirely of employees at the new hotel would be an appropriate bargaining unit under section 9(b) of the Act. 29 U.S.C. § 159(b).[3] Sheraton-Kauai and Local 5 do not dispute the conclusion that the local unit would be appropriate,[4] but contend that when, as here, the more inclusive, multiple location unit is also an appropriate one, the addition of employees at a new location to that unit by agreement of the employer and the union cannot be considered an unfair labor practice, at least in the absence of a claim by a rival union that it represents a majority of the new employees. The Board's policy, however, is that whenever the single-location unit is an appropriate one for collective bargaining the employees in that unit should be given an opportunity to determine for themselves which union they wish to represent them, or whether they wish to reject union representation entirely. We think this policy is a lawful exercise of the discretion vested in the Board by the Act.
 
 
 5
 Section 9(b) of the Act, which requires the Board to determine the unit appropriate for collective bargaining, provides that the Board shall choose the unit which will "assure to employees the fullest freedom in exercising the rights guaranteed" by the Act; namely, "The right to self-organization, to form, join, or assist organization * * * [and] the right to refrain from any or all such activities." Section 7 of the Act, 29 U.S. C. § 157. And, of course, the Board should exercise its authority under section 9(b) in such a way as to effectuate the Act's general purpose of minimizing industrial strife by encouraging collective bargaining. 29 U.S.C. § 151. Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 165, 61 S.Ct. 908, 85 L.Ed. 1291 (1941); NLRB v. Sunset House, 415 F.2d 545, 548-549 (9th Cir. 1969); Spartans Industries, Inc. v. NLRB, 406 F.2d 1002, 1005 (5th Cir. 1969); NLRB v. Food Employees Council, Inc., 399 F.2d 501, 504 (9th Cir. 1968); Hall, The Appropriate Bargaining Unit, 18 Western Res.L. Rev. 479, 482, 535-536 (1967); Note, The Board and Section 9(c) (5), 79 Harv. L.Rev. 811, 833-834 (1966).
 
 
 6
 These standards are general. They define ultimate objectives rather than immediate means, and necessarily allow the Board, enlightened by continuing experience, to exercise "a large measure of informed discretion." Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). See also NLRB v. Jones & Laughlin Co., 331 U.S. 416, 425-427, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947); Pittsburgh Plate Glass Co. v. NLRB, supra, 313 U.S. at 152-153, 165, 61 S.Ct. 908. The Board has dealt with the problem involved here within this framework.
 
 
 7
 For some time the Board held that appropriate units in multiple-location retail chain operations should include all employees at locations within the geographic area which the employer treats as a unit. The Board eventually concluded, however, that this policy "too frequently * * * operated to impede the exercise by employees in retail chain operations of their rights of self-organization guaranteed by Section 7 of the Act," Sav-On Drugs, Inc., 138 N.L. R.B. 1032, 1033 (1962), and developed a new policy to better protect those rights. Under the new policy, the appropriate unit is to be "determined in the light of the circumstances of each case," Id. at 1033, with each single-unit location within a multiple-location enterprise considered presumptively correct for collective bargaining. See Hagg Drug Co., 169 N.L.R.B. No. 111 and cases cited at n. 3 (1968). As the Board stated in Hagg:
 
 
 8
 "Absent a bargaining history in a more comprehensive unit or functional integration of a sufficient degree to obliterate separate identity, the employees' `fullest freedom' is maximized, we believe, by treating the employees in a single store or restaurant of a retail chain operation as normally constituting an appropriate unit for collective-bargaining purposes."
 
 
 9
 In developing this policy the Board considered the possibility that employer operations would be disrupted, but concluded: "Bargaining in less than employerwide units has been effectively conducted in other industries without such results, and no reason has been presented, nor are we aware of any, which indicates that the situation would be different in the retail chain industry." Hagg Drug Co., supra. See also Frisch's Big Boy Ill-Mar, Inc., 147 N.L.R.B. 551 (1964).
 
 
 10
 These rulings directly concerned unit determinations in connection with initial representation petitions. As the Board has noted, however, essentially the same factors are involved in determining whether employees at a subsequently established single location should be absorbed into an existing multiple-location unit without their consent. In the latter situation, section 7 rights are even more clearly at stake. If the Board, in making its initial representation determination, decides that a multiple-location unit is appropriate, employees at each included single location have an opportunity to participate in the resolution of the representation issue. But if employees at a new single location are simply absorbed into the multiple-location unit by accretion, they are denied that opportunity. Nor does the procedure for decertification under section 9 of the Act provide an adequate remedy for these employees.[5] Hence, the Board has held that even though it might have found an overall unit appropriate on a representation petition, and thus have given all employees at all locations an equal voice in the initial representation decision, it would not "under the guise of accretion, compel a group of employees, who may constitute a separate appropriate unit, to be included in an overall unit without allowing those employees the opportunity of expressing their preference in a secret election or by some other evidence that they wish to authorize the Union to represent them." Melbet Jewelry Co., 180 N.L.R.B. No. 24 (1969). See also Super Valu Stores, Inc., 177 N.L.R.B. No. 63 (1969); Warehouse Markets, Inc., 174 N.L.R.B. No. 70 (1969).
 
 
 11
 It is possible that at some future time the Board may conclude on the basis of further experience that employee self-determination and stable collective bargaining can be better attained by some other approach to the problem. Cf. Packard Motor Car Co. v. NLRB, supra, 330 U.S. at 492-493, 67 S. Ct. 789, 91 L.Ed. 1040. But since the present policy appears to be a reasonable means for accomplishing the statutory purposes, the Board is entitled to enforcement of its decree. NLRB v. Sunset House, supra, 415 F.2d 545, 548; Spartans Industries, Inc. v. NLRB, supra, 406 F.2d 1002, 1005; NLRB v. Master Lake Success, Inc., 287 F.2d 35 (2d Cir. 1961). Cf. Local 919, Retail Clerks International Association v. NLRB, 135 U.S.App.D.C. 103, 416 F.2d 1118, 1120 (1969).
 
 
 12
 Sheraton-Kauai and Local 5 rely principally upon NLRB v. Appleton Electric Co., 296 F.2d 202 (7th Cir. 1961). Arguably, Appleton is distinguishable on its facts, for in that case the new plant was located immediately adjacent to another plant of the employer, and the operations of the two plants were functionally integrated. We agree with the company and the union, however, that the rationale of Appleton is irreconcilable with the Board's decision here.
 
 
 13
 The Appleton court apparently adopted the view that where the larger multiple-location unit is an appropriate one for collective bargaining, and the employer and the union have entered into a valid collective bargaining contract which includes a provision extending the agreement to employees at additional locations within the larger unit without their consent, compliance with this accretion clause does not violate the Act, even though the smaller single-location unit might also be an appropriate one.
 
 
 14
 Whether or not the Board might adopt this policy, or some modification of it, as reasonably calculated to accomplish the objectives of the Act, we are not convinced that we may impose it upon the Board as a matter of law as an absolute limitation upon the Board's authority under section 9(b).
 
 
 15
 The arguments advanced in Appleton for doing so do not persuade us.
 
 
 16
 It is true, as the Appleton court points out, that "Congress gave to a union selected by a majority in an appropriate unit the right to obtain recognition for the entire unit including a non-consenting minority," 296 F.2d at 206; but as we have noted earlier, this right is based upon the premise that employees in the unit have been afforded an opportunity to express their wishes on the question of representation at the outset. The problem of subsequently added employees, which is involved in this case, is not dealt with specifically in the Act; and, as we have said, the Board's solution of protecting the right of self-determination of these employees whenever, as a group, they would constitute an appropriate collective bargaining unit, is consistent with the statute's purposes.
 
 
 17
 The Appleton opinion suggests that the issue is controlled by the existence of an accretion clause in a lawful collective bargaining contract. But neither the Board's discretion under section 9(b), nor the employees' right of self-determination under section 7, can be limited by contract between a union and employer. NLRB v. Sunset House, supra, 415 F.2d at 547, 548; Welch Scientific Co. v. NLRB, 340 F.2d 199, 202-203 (2d Cir. 1965). Cf. Local 919, Retail Clerks International Association, supra, 416 F.2d at 1118. And the fact that section 7 guarantees employees the right to reject union representation entirely precludes the Board from giving controlling weight to the Appleton court's concern that non-enforcement of an accretion clause would deprive employees at the new location of union representation during the period of time required to prepare for and hold a representation election.
 
 
 18
 The alternate contention advanced by Local 5 and Sheraton-Kauai — that an uncoerced majority of the employees at the Sheraton-Kauai hotel expressed their wish to be represented by Local 5 — requires little discussion. Both the company and the union advised the new employees that they were covered by the existing collective bargaining agreement, and, accordingly, were required to join Local 5 within 31 days. As the trial examiner stated in a finding adopted by the Board, "these employees, having been told in effect that they were already under the Statewide agreement and under that agreement would be required to join the Respondent Union, were not exercising the required freedom of choice when on February 12, or thereafter, they executed union authorization cards [but] * * * were merely ratifying what they had been advised had already been done, and under such circumstance their ratification was without effect."
 
 
 19
 There was no evidence of actual threats or subjective feelings of coercion; but in this case, as in NLRB v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 361, 85 L.Ed. 368 (1941), the Board was entitled to infer coercion from "conditions or circumstances which the employer [and union] created or for which [they were] fairly responsible and as a result of which it may reasonably be inferred that the employees did not have the complete and unfettered freedom of choice which the Act contemplates." See also NLRB v. Jan Power, Inc., 421 F.2d 1058, 1063 (9th Cir. 1970).
 
 
 20
 Finally, Sheraton-Kauai and Local 5 challenge the provision of the Board's order requiring them to reimburse the employees for union initiation fees and dues. The Board orders reimbursement where coercion is established either by direct evidence or, as here, by inference from the fact that the employees joined the union after being informed that they were bound by a collective bargaining agreement containing a union security clause which conditions continuation of employment upon union membership. See generally The Brown-Olds Dues Reimbursement Remedy, 45 U.Va.L.Rev. 1192, 1197-1208 (1959). Reimbursement is not ordered unless coercion is established either directly or by inference. Compare Super Markets General Corp., 170 N.L.R.B. No. 61 (1968), and Sunset House, 167 N.L.R.B. No. 132 (1967), with Spartan-Atlanta Department Stores, Inc., 169 N.L.R.B. No. 47 (1968). See NLRB v. Jan Power, Inc., supra, 421 F.2d at 1063-1064; NLRB v. Getlan Iron Works, Inc., 377 F. 2d 894, 896 (2d Cir. 1967), and cases there cited; NLRB v. Sunset House, supra; NLRB v. Teamsters & Allied Workers, Local 996, 313 F.2d 655, 660-661 (9th Cir. 1963); NLRB v. Revere Metal Art Co., 280 F.2d 96, 100-101 (2d Cir. 1960); NLRB v. General Drivers, Local 886, IBT, 264 F.2d 21, 23 (10th Cir. 1959). But see NLRB v. Masters Lake Success, Inc., 287 F.2d 35 (2d Cir. 1961).
 
 
 21
 The Board's approach effectuates the policies of the Act, for it "returns to the employees what has been taken from them to support an organization not of their free choice and places the burden upon the Company [and Union] whose unfair labor practices brought about the situation." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 541, 63 S.Ct. 1214, 1219, 87 L.Ed. 1568 (1943).[6]
 
 
 22
 The Board's order will be enforced.
 
 
 
 Notes:
 
 
 [1]
 The Board's decision and order are reported at 177 N.L.R.B. No. 13
 
 
 [2]
 We approved the definition of "accretion" as "merely the addition of new employees to an already existing group" in NLRB v. Food Employers Council, Inc., 399 F.2d 501, 502-503 (9th Cir. 1968). The most obvious example is the addition of employees to an existing unit through normal turnover
 
 
 [3]
 The Board has long recognized that in some circumstances either a large unit or smaller units included within it may be appropriate for collective bargaining. Note, The Board and Section 9(c) (5), 79 Harv.L.Rev. 811, 822 (1968)See NLRB v. Smith, 209 F.2d 905, 907 (9th Cir. 1954).
 
 
 [4]
 The trial examiner listed the following factors supporting the conclusion that the Sheraton-Kauai hotel employees would constitute an appropriate bargaining unit:
 "There is at least partial autonomy in the Kauai operation. It has a local supervisory staff and a local manager. The latter, necessarily, is in charge and responsible for day-to-day operations inasmuch as a single General Manager for all the Sheraton operations could not personally supervise such day-to-day operations in each of the hotels. The local manager had the authority to hire and to discharge, the latter qualified by the provision [for an appeal] to the General Manager. * * * Some 90 percent of employees at the Sheraton-Kauai operation were hired on the Island of Kauai, and it may be assumed that such matters as promotions and demotions limited to the Kauai hotel would be handled by the local manager and department heads. There is a distance of some 100 miles between the Kauai and Honolulu operations, most of it over water."
 
 
 [5]
 There are two reasons why the decertification remedy is inadequate. The first is the Board's "established policy, in a representation case [of] not inquir[ing] * * * into the question of whether at the time the contract was executed a majority of the employees had designated the union as their bargaining representative." Columbia River Salmon & Tuna Packers Ass'n, 91 N.L.R.B. 1424, 1427 (1950);see also Garment Workers v. NLRB, 366 U.S. 731, 737 n. 8, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). The second is the Board's rule that the "unit appropriate in a decertification election must be coextensive with either the unit previously certified or the existing contract unit." W. T. Grant Co., 179 N.L.R.B. No. 114 (1969). See International Ass'n of Tool Craftsmen v. Leedom, 107 U.S. App.D.C. 268, 276 F.2d 514, 515, 516 (1960).
 
 
 [6]
 Our decision in Intalco Aluminum Corp. v. NLRB, 417 F.2d 36 (9th Cir. 1969), refusing to enforce the reimbursement provisions of a Board order, can be reconciled with our subsequent decision in NLRB v. Jan Power, Inc., 421 F.2d 1058 (9th Cir. 1970), only by restricting the earlier decision to its facts — that is, to a case in which prior to the time the collective bargaining agreement was extended to the new employees, the employer had a good faith belief that a majority of the employees had chosen to be represented by the union
 
 
 
 23
 JERTBERG, Circuit Judge, concurring and dissenting:
 
 
 24
 I concur in the majority opinion except that portion of the Board's order which requires Company and Union to jointly:
 
 
 25
 "reimburse said Company's employees for any initiation fees, dues, or other moneys paid or checked off pursuant to the agreement applied to Respondent Company's employees or to any extension, renewal, modification, or supplement thereof, or to any agreement superseding it, plus interest as set forth in Isis Plumbing & Heating Co., 138 NLRB 716."
 
 
 26
 In the circumstances of this case it is my view that such part of the order is oppressive and punitive.
 
 
 27
 I am unable to distinguish in principle this case from Intalco Aluminum Corporation v. NLRB, 417 F.2d 36 (9th Cir. 1969), in which this Court refused to enforce the provision of the order of the Board in that case requiring reimbursement of dues and other moneys paid to the Union by the employees of the Company.
 
 
 28
 The Trial Examiner in this case refused to recommend to the Board that reimbursement be required. He stated:
 
 
 29
 "I shall not recommend reimbursement of Kauai employees by the Respondents of dues and other fees paid under the Statewide agreement for the several reasons that by the date of the issuance of this decision Kauai employees will have been receiving the benefits and protection of the legitimately negotiated Statewide agreement for almost a year; because I am convicted that the repondents, in bringing Kauai employees within the coverage of the Statewide agreement acted in good faith, a single Statewide unit also being appropriate for purposes of collective bargaining; and because at the time the Employer recognized the Respondent Union for its Kauai employees, no other labor organization had asserted a claim to represent these employees.[5]
 
 
 30
 5. Obviously, the ILWU letter to Respondent of intent to organize did not constitute a claim of representation."
 
 
 31
 The reasons given by the Board for rejecting the recommendation of the Trial Examiner are not persuasive to me.
 
 
 32
 For the reasons stated by the Trial Examiner, and because I believe that the remaining portions of the remedial order of the Board adequately effectuate the purposes of the Act, I would decline to enforce the Board's order requiring reimbursement.