**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PITTSBURGH PLATE GLASS CO., Respondent,**
and
**United Glass and Ceramic Workers of North America, AFL–CIO, Intervenor.**
**No. 7863.**

United States Court of Appeals Fourth Circuit.

Argued June 17, 1959.

Decided Sept. 2, 1959.

Norton J. Come, Deputy Assistant General Counsel, Washington, D. C. (Jerome D. Fenton, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Melvin J. Welles, Attorney, National Labor Relations Board, Washington, D. C., on brief), for petitioner.

Milton C. Denbo, Washington, D. C. (Mark C. Curran and Shroyer, Denbo & Doolan, Washington, D. C., on brief), for respondent.

Abraham L. Friedman, Newark, N. J. (Samuel L. Rothbard, Newark, N. J., on brief), for United Glass and Ceramic Workers of North America, AFL-CIO.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

This petition for enforcement of an order of the National Labor Relations Board relates primarily to a determination of the Board that the electricians, including shift, shop and electronics electricians, instrument labor men and apprentices in the employ of Pittsburgh Plate Glass Company constitute an appropriate craft unit for purposes of collective bargaining at its plant in Cumberland, Maryland, although they comprise a small minority of the employees and the operations of the plant are highly integrated.[1]

The present proceeding was brought when the Company refused to bargain

---

1. At the time of the Board's decision the electrical group, operating under the supervision of the plant electrical engineer, consisted of 16 shift electricians, 6 shop electricians and 2 instrument labor men.

It was anticipated that there would be approximately 55 electricians when the plant came to full production and that ultimately the plant would hire approximately 600 employees.

with the Union as the representative of the group and charges were filed that the Company had violated § 8(a)(5)(1) of the statute. As the result of this proceeding the Board passed an order requiring the Company to bargain with the group and now seeks enforcement of the order.

The Company's plant commenced operations on September 8, 1956, before it was completely finished. On October 11, 1956, the International Brotherhood of Electrical Workers (Electrical Workers) filed a representation petition, pursuant to § 9(c) of the Act, requesting certification as the bargaining representative of the electricians at the plant. At that time the plant employees were not represented by any union. However, on November 8, 1956, the Company and the United Glass and Ceramic Workers of North America, AFL-CIO, (Glass Workers), entered into an agreement whereby an existing collective bargaining contract between the Company and the Glass Workers at all of the other flat glass plants of the Company in this country was made applicable to the production and maintenance employees at the Cumberland plant. Thereupon the Glass Workers intervened in the representation proceeding and joined the Company in urging that the petition of the Electrical Workers should be dismissed because the integrated nature of the plant's operations and the history of bargaining at the Company's other plants, and in the plate glass industry generally, rendered any bargaining unit inappropriate other than one embracing all the production and maintenance employees.

On May 23, 1957, the Board rejected this contention and issued its decision and direction of an election. It based its conclusion on its decision in American Potash & Chemical Co., 107 N.L.R.B. 1418, wherein it held that the rights of separate representation should not be denied to members of a craft group merely because they were employed in an integrated industry and had previously adopted a pattern of bargaining on an industrial basis. Finding that the elec-

tricians formed a distinct group of skilled journeymen craftsmen, the Board concluded that it was an appropriate unit for collective bargaining. Accordingly, it directed an election among the employees of the group at which the Electrical Workers received 12 votes against 9 votes for the Glass Workers, and was therefore certified as the bargaining representative of the unit.

The power of the Board to determine the appropriate bargaining unit in a particular plant is derived from § 9(b) of the statute, 29 U.S.C.A. § 159(b), which provides in relevant part that:

> "The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, That the Board shall not * * * (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation * * *."

The Board had occasion to consider the relative advantages of the plant unit as opposed to the craft unit in its decision in National Tube Co., 76 N.L.R.B. 1199, on April 7, 1948. The Tube Company, a wholly owned subsidiary of the United States Steel Corporation, was engaged in the manufacture and sale of steel and tubular products at several plants in various parts of the United States. Only the plant at Lorain, Ohio, was involved in the case. The Bricklayers, Masons and Plasterers International Union of America-AFL petitioned the Board to establish a craft unit of bricklayers and apprentices at the plant. The United Steel Workers of America-AFL intervened and joined the Company in opposing the Bricklayers' petition. The United Steel Workers had been certified in 1942 as the exclusive bargaining repre-

sentative for a multiple plant unit of the Company's production and maintenance employees and thereafter had bargained for them under a series of collective bargaining agreements following, in this respect, the pattern of collective bargaining generally in the steel industry. No unit confined to bricklayers had ever been established among the employees in any operation of the United States Steel Corporation or in any of the plants of the sixty-five other companies engaged in the production of basic steel. The Bricklayers contended that § 9(b)(2) of the Act removed from the Board's discretion not only the power to rely on a prior decision as the basis for finding a craft unit inappropriate, but also the power to find such a unit inappropriate by reason of collective bargaining history or any other circumstances upon which the Board had been accustomed to rely. The basis of this contention consisted of various statements found in the legislative history preceding the passage of the amendment of the Act. The Board overruled this contention on the ground that the proviso was not ambiguous and did not limit the Board's discretion to find a craft unit inappropriate so long as there was no reliance on a prior Board determination. It therefore held that the legislative history was not controlling; but it also held, upon an examination of the legislative history, that "there is no basis for finding a Congressional intent to prohibit the use of a prior Board determination or any bargaining history based thereon as a factor to be considered so long as neither is made the sole ground upon which the Board predicates its decision." Coming to the merits of the case, the Board concluded that the bargaining history of an industry was a "weighty factor" to be considered by the Board in making its decision. It found that the bricklayers in the plant, unlike usual craft maintenance employees, were engaged in a definite program of replacing and repairing instrumentalities used in the continuous production of basic steel and that their functions were therefore intimately connected with the steel-making process. It also found that the bricklayers and steel production employees enjoyed similar working conditions and had been represented together under a series of bargaining agreements between the employer and the United Steel Workers and that, because of the integrated nature of the operations in the industry, any change in the unit governing the bargaining relations between the employer and its employees would be detrimental to the basic wage-rate structure underlying the operations and would necessarily have an adverse effect upon the productive capacity in an industry of national concern. It therefore denied the Bricklayers' petition for separate representation.

Subsequently the Board made similar rulings affecting three other integrated industries, that is, the wet milling industry in Corn Products Refining Co., 80 N.L.R.B. 362, Nov. 18, 1948, the lumber industry in Weyerhaeuser Timber Co., 87 N.L.R.B. 1076, Dec. 16, 1949, and the aluminum industry in Permanente Metals Co., 89 N.L.R.B. 804, Apr. 27, 1950. In each of these cases the Board emphasized the need for collective bargaining on an industrial basis where the industry involved is highly integrated and its basic operations are interdependent.

On March 1, 1954, however, in American Potash & Chemical Corp., 107 N.L.R.B. 1418, the Board reversed this policy. This case involved an employer engaged in the manufacture of various basic chemical products by a continuous flow process and the operations demonstrated the same type of integration as was found to exist in basic steel. The United Mine Workers of America (AFL) had been the bargaining representative of the employees on a plantwide basis since 1941 and the continuance of a plantwide bargaining unit was sought by the employer and certain other unions. Separate bargaining units, however, were sought by other unions for the electricians, the engineering department, the pump packers and oilers, the riggers, and the tool room keepers. In considering these conflicting contentions, the Board referred

to its decision in the National Tube case and held that it had had the effect of permanently foreclosing the possibility of establishing craft units in an entire industry by freezing the industry into an industrial unit for bargaining purposes, and it concluded that this result was inconsistent with the legislative intent manifested in § 9(b)(2) of the statute. The Board found it necessary to re-examine the legislative history and in so doing came to a conclusion directly opposite to that which it reached in National Tube. It held that Congress had taken the position that the specific interests of members of a skilled craft outweigh the community of interests that exist among employees in general, and that the right of separate representation should not be denied the members of a craft group merely because they are employed in an industry which involves highly integrated product processes and in which the prevailing pattern of bargaining is industrial in character. It announced that it would not extend the practice of denying craft severance on an industrywide basis.

In overruling its decision in National Tube, the Board said:

"In adopting this new rule, we have given grave consideration to the argument of employer and union groups that fragmentation of bargaining units in highly integrated industries which are characteristic of our modern industrial system can result in loss of maximum efficiency and sometimes afford an opportunity for jurisdictional disputes as to work assignments. We are cognizant of the disruptive economic and social conditions that can and sometimes do occur as the result of craft existence in industrial plants, as where, for example, a small cohesive craft group, by striking, closes down a large industrial plant employing thousands of workers. The alternative, however, is to deny crafts separate representation, and experience has shown that this approach, which was predominant under the American Can decision,[2] was no less productive of labor unrest.

"The lesson which we draw is that, consistent with the clear intent of Congress, *it is not the province of this Board to dictate the course and pattern of labor organization in our vast industrial complex. If millions of employees today feel that their interests are better served by craft unionism, it is not for us to say that they can only be represented on an industrial basis or for that matter that they must bargain on strict craft lines. All that we are considering here is whether true craft groups should have an opportunity to decide the issue for themselves. We conclude that we must afford them that choice in order to give effect to the statute.* Whatever may be lost in maximum industrial efficiency, and experience has not shown that this loss is measurably greater than that which flowed from the rigid doctrine of American Can, is more than compensated for by the gain in industrial democracy and the freedom of employees to choose their own unions and their own form of collective bargaining. [Emphasis supplied]

"In adopting our new rule, we wish to make it clear that the requirement that the unit sought to be severed must be a true craft group will be rigidly enforced in cases where severance is sought on that basis. We propose to exercise great care in making certain that in the administration of this rule only

---

**2.** In that decision (13 N.L.R.B. 1252), the Board held that a history of bargaining in a plant-wide unit might, *of itself*, provide sufficient basis for denying a subsequent request for separate craft representation. The limitation in Section 9(b) (2) of the amended Act (p. 6, supra) [270 F.2d 170] reflects Congress' disapproval of this practice. See Leg.Hist. of the Labor Management Relations Act 1947 (G.P.O., 1948), pp. 417–418, 1009.

groups exercising genuine craft skills will be embraced within the ambit of the rule, and that the requirements will not be relaxed over a period of time. We feel that the problem is one of administration rather than concept. We are also of the opinion that under the rule we are adopting fewer groups will be severed but that, at the same time, the principle of craft independence will be maintained."

We understand this decision to mean, as pointed out by a dissenting member of the Board, that the Board has adopted the flat rule that craft units must be split off from an established industrial unit whenever requested by a union that traditionally represents employees in the craft and that this rule is to be applied irrespective of the nature or the degree of integration in the industry and irrespective of the established practice of collective bargaining prevailing in the industry. Moreover, we understand that this rule has been adopted in deference to the views expressed on the floor of Congress when § 9(b)(2) of the Act was under consideration by that body, and in deference to the wishes of craft employees who feel that their interests are better served by craft unionism, and that the interests of millions of employees who prefer to bargain on a plantwide basis are not to be taken into consideration. Indeed, the Board seems to abdicate its authority in the premises, for it says that "under the circumstances indicated, * * * it is not for us to say that they [the craftsmen] can only be represented on an industrial basis or for that matter they must bargain on strict craft lines. All that we are considering here is whether true craft groups should have an opportunity to decide the issue for themselves. We conclude that we must afford them that choice in order to give effect to the statute."

In subsequent decisions, the Board has repeatedly adhered to this policy. If in a given case it is shown that certain employees are members of a craft and desire to be represented by an appropriate craft union, that is the end of the matter. No other evidence is considered and the wishes of the craftsmen are given effect, unless indeed it appears that the plant is engaged in one of the four favored industries referred to above. See U. S. Smelting, Refining & Mining Co., 116 N.L.R.B. 661, 663; Bay City Division, Dow Chemical Co., 116 N.L.R.B. 1602, 1605; General Refractories Co., 117 N.L.R.B. 81, 83; Bethlehem Pacific Coast Steel Corp., Shipbuilding Division, 112 N.L.R.B. 579, 581.

The decision of the Board follows the same pattern in the case at bar. Rejecting the contention of the Company and the Glass Workers that the petition to recognize the electricians as a separate craft unit should be dismissed because of the integrated nature of the Company's operations and the previous pattern of collective bargaining on an industrial basis in the flat glass industry, the Board said:

"* * * We find no merit in this contention. In American Potash & Chemical Corporation, 107 N.L.R.B. 1418, the Board clearly stated that it will not further extend the National Tube doctrine beyond those industries in which it had already been applied, and recently the Board has reiterated this policy on several occasions. Moreover, there is nothing raised herein concerning integration or pattern of collective bargaining within the glass industry which has not been heretofore considered by the Board, or which warrants a change of our established policy."

The departure of the Board from established principles in this new approach is manifest. The Board was right, in the first instance, in reaching the conclusion that the addition of subsection 2 of § 9(b) created no ambiguity. As amended § 9(b) does not strip the Board of its original power and duty to decide in each case what bargaining unit is most appropriate to assure to the employees the fullest freedom in collective bargaining, whether it be an employer

unit, craft unit, plant unit or subdivision thereof. It merely tells the Board that it must not decide that a craft unit is inappropriate in a particular case on the ground that a different unit had been established by it in a prior determination. In effect it frees the Board from the domination of its past decisions and directs it to re-examine each case on its merits and leaves it free to select that unit which it deems best suited to accomplish the statutory purposes. Undoubtedly the legislative debates and the committee reports indicated dissatisfaction on the part of members of Congress with the rigid attitude of the Board in adhering to its prior decisions; but Congress clearly did not command the Board, as it could have done,[3] to establish a craft bargaining unit whenever requested by a qualified craft union, or relieve the Board of its duty to consider the interests of the plant unions and the wishes of the employees who desire to bargain on a plantwide basis. The amended section expressly requires the Board to decide *in each case* what unit would be most appropriate to effectuate the overall purpose of the Act to preserve industrial peace.

The Board was not authorized by the amendment to surrender to anyone else its statutory duty to determine in each case the appropriate unit for collective bargaining. It had been set up by Congress as an independent body presumed to possess expert knowledge and wisdom in the field superior to that of the courts or of Congress or of the active participants in the industrial world and therefore better fitted than anyone else to decide what would best serve the working man in his effort to bargain collectively with his employer, and what would best serve the interest of the country as a whole. Yet, as we have seen, the Board declared in American Potash that it was not for it to say whether the employees should be represented on an industrial basis or must bargain along strict craft lines, but that it must allow the employees the right to make the choice. In other words, the Board now reads into the statute the amendment urged upon but rejected by Congress. This does not seem to be a proper exercise of the duty of the Board to select an appropriate bargaining unit. In Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 156, 61 S.Ct. 908, 914, 85 L.Ed. 1251, involving the same employer now before us in the instant case, the Court sustained the Board in overruling the wishes of a large majority of the employees in one of the Company's plants who desired to be represented by their own union and in holding that a single organization should represent the employees in all of the Company's plants. The Court said:

"* * * the availability of a workers' organization for purposes of representation is not in itself decisive in determining the appropriate bargaining unit. Naturally the wishes of employees are a factor in a Board conclusion upon a unit. They are to be weighed with the similarity of working duties and conditions, the character of the various plants and the anticipated effectiveness of the unit in maintaining industrial peace through collective bargaining. * * *"

■■ There can be no doubt as to the breadth of the Board's power and discretion to select the appropriate bargaining unit for the employees in each case. The determination rests in the sound discretion of the Board and will not be disturbed unless it is arbitrarily and unreasonably exercised. May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145; N. L. R. B. v. Libbey-Owens-Ford Glass

3. During the Senate hearings representatives of labor unions urged that § 9(b) be amended to require the establishment of craft units in all cases unless a majority of the craftsmen involved decided otherwise. See Hearings Before Senate Committee on Labor and Public Welfare on S. 55, 80th Cong., 1st Sess., p. 1007 et seq., and p. 1052; 2 Leg.Hist. of Labor Management Relations Act (1947) p. 1009.

Co., 4 Cir., 241 F.2d 831, 834.[4] Moreover, it has been held that the Board may, in its discretion, change its policies from time to time in order to effectuate the purposes of the Act. N. L. R. B. v. Kobritz, 1 Cir., 193 F.2d 8; N. L. R. B. v. National Container Corp., 2 Cir., 211 F.2d 525, 534; Optical Workers' Union Local 24859 v. N. L. R. B., 5 Cir., 227 F.2d 687, 691; N. L. R. B. v. Stanislaus Implement & Hardware Co., 9 Cir., 226 F.2d 377, 378. The Supreme Court has said that administrative agencies have the choice, in their informed discretion, to proceed by general rule or by ad hoc decisions. Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 200–203, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995; N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 348, 73 S.Ct. 287, 97 L.Ed. 377. Hence the Board contends that it had the power in the American Potash case to lay down the general rule that craft units rather than plantwide units best serve the interests of the employees and thereafter to apply the rule in subsequent cases. Such a rule or policy, it has been said, is formulated in the exercise of the legislative power of the Board as distinguished from its adjudicative function of finding the facts of a particular case. See 2 Davis, Administrative Law, p. 353.

■ It is obvious, however, that the Board may not be arbitrary in the exercise of its functions to promulgate a policy applicable to any class of cases. That was strikingly shown in the decision of the Supreme Court in Office Employees International Union, Local No. 11 A.F.L.-C.I.O. v. N. L. R. B., 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846, where it was held beyond the power of the Board to refuse to assume jurisdiction over an entire class of employers consisting of labor unions actively engaged as employers of workers. See also Hotel Employees Local No. 255 v. Leedom, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143.

■ In our opinion the action of the Board in formulating the policies described above and in applying them in the pending case was arbitrary and discriminatory. Instead of selecting an appropriate bargaining union after a study of the circumstances of the case before it, it followed its announced policy of acceding to the wishes of a small group of employees, comprising a craft, for separate representation, although potent reasons existed for the plantwide representation desired by the employers and the great majority of the workers. Conceivably such a decision could be justified by the circumstances of a given case, but in this instance it must be condemned as discriminatory, in view of the conflicting policy and action of the Board in denying craft representation and directing plantwide representation under precisely similar circumstances in certain selected fields.

We find no reasonable explanation for the discrimination. The exclusion of the steel, lumber, aluminum, and wet milling industries from the craft union rule was based by the Board on two facts: first, that in each case the industry was thoroughly integrated and second, that it had had a long history of plantwide bargaining. But precisely the same conditions exist in the plate glass industry, with which we are now concerned, since it is as much if not more integrated than those in the favored group and has an unbroken history of plantwide bargaining. The Board itself makes no attempt to distinguish between it and the favored group. It excuses its discrimination on the ground that it had previously approved plantwide bargaining in each of the four and that "it would not be wise or feasible to upset a pattern of bargaining already firmly established." This argument however defeats itself, for the pattern of plantwide bargaining in the plate glass industry is as firmly established as in any other and if it is disrupted by the automatic extension of

---

4. This case related to the fibre glass industry and there was no showing that this industry is integrated as is the flat glass industry involved in the case at bar.

craft union bargaining, the ensuing confusion and disturbance of industrial peace are as likely to occur as they would be in the industries which the Board protects.

This discrimination in favor of the four industries cannot be passed over as past history which cannot now be corrected, for the Board persists in denying craft representation in the selected four in new cases that come before it. A recent summary of the Board's rule is found in its Twenty-Third Annual Report for the Fiscal Year Ended June 30, 1958 at pages 35–36 as follows:

> "The Board announced during the past year that the National Tube doctrine, under which separate craft or departmental representation had been denied in certain industries, viz., basic steel, basic aluminum, lumber, and wet milling, is applicable not only in the case of plants with a prior industrial bargaining history but also where new plants in those industries are involved.

> "However, adhering to the policy announced in the American Potash case, the Board has again declined to extend the National Tube doctrine and has permitted separate craft or departmental representation, regardless of integration of operations, in all industries other than basic steel, basic aluminum, lumber, and wet milling." [Footnotes omitted]

Plainly the new plants bear the same relation to the older plants of the four industries as the Cumberland plant bears to the older plants of the Pittsburgh Plate Glass Company; but here again the Board offers no explanation for its inconsistent actions. Its policy with respect to the four industries is solely based, so far as we can see, on its prior determination that in these industries craft representation will not be tolerated. This position is not only open to the objections hereinbefore outlined, but plainly constitutes a violation of the express provision of § 9(b)(2) of the statute, which forbids the Board to decide that any craft unit is inappropriate on the ground that a different unit has been established by a prior Board determination.

We reach the conclusion that the Board's order should not be enforced, and have no occasion to consider the additional defense of the Company that enforcement of the order should be denied because one of the officers of the local union failed to file the affidavit required by § 9(h) of the statute.

Enforcement denied.