**EXECUTIVE BOARD, LOCAL 1302, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, Plaintiff,**

v.

**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, Defendant.**

**Civ. A. No. 12706.**

United States District Court,
D. Connecticut.

March 15, 1972.

Matthew Shafner, O'Brien, Shafner & O'Regan, Groton, Conn., for plaintiff.

Norman Zolot, Hamden, Conn., for defendant.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

The plaintiff, Executive Board Local 1302, United Brotherhood of Carpenters & Joiners, (Local) and the defendant International Union, United Brotherhood of Carpenters and Joiners of America, (International), have filed cross-motions for summary judgment pursuant to Rule 56, Fed.R.Civ.P. Both parties represent, that for the purpose of these motions, no factual issues remain to be determined and the sole issue before the Court is one of law.

The suit was commenced on August 13, 1968, pursuant to §§ 302 and 304 of the Labor-Management Disclosure Act, 29 U.S.C. §§ 462 and 464. At that time, the plaintiff requested a permanent and a preliminary injunction ordering the defendant: (1) to remove the trusteeship imposed on the local union by the parent organization; (2) to direct the trustee to reinstate before the National Labor Relations Board (NLRB) the plaintiff's petition for disaffiliation from the Metal Trades Council, the certified bargaining agent for 11 of the 13 trade unions at the Electric Boat Division of General Dynamics (Electric Boat); (3) to restrain the parent International from interfering with the local union in the legitimate conduct of its affairs; and (4) to declare the actions of the trustee in withdrawing the local union's petition for separate certification'

from consideration before the NLRB to be a nullity and to reinstate said petition before the Board.

The defendant first moved for a dismissal of the action on October 28, 1968, claiming that the issues were moot, because the trusteeship had been terminated. After a hearing on October 28, 1968, the Court found that item (1) of the plaintiff's prayer for relief did become moot on October 15, 1968, when the trusteeship terminated. The Court also concluded, that inasmuch as the authority of the trustee to conduct the business of the Local was ended, the relief sought in item (2) could not be effected, even if the Court were disposed to grant relief, and thus it too, had become mooted. However, the Court refused to dismiss the plaintiff's third and fourth prayers for relief, since they related to current and future activity of the Local. On May 29, 1969, the Court denied cross-motions for summary judgment, on the grounds that genuine issues of fact still remained to be determined.

Counsel for the parties currently expressed their mutual agreement, that the plaintiff is not challenging the procedural aspects leading to the imposition of the trusteeship. The only question of law remaining to be resolved now is whether or not the parent union had the legal right under the International's constitution and the existing federal law, to impose a trusteeship, for the purpose of forestalling or depriving the local union of its right to petition the NLRB for permission to disaffiliate from the local Metal Trades Council, and to be certified itself as the bargaining agent for the members of the plaintiff Local 1302.

### Factual Summary

The relevant facts have been generally agreed upon by the parties. For more than 20 years prior to August 1967, the plaintiff local union had been continuously an active member in the Metal Trades Council in London County. The Council's executive board was comprised of a specified number of representative delegates from each local union affiliated with the Metal Trades Council.[1] The national organization of which the Council is a part is known as the Metal Trades Department of the American Federation of Labor and the Congress of Industrial Organization. Its membership is limited to national and international unions chartered by or affiliated with the AFL–CIO and Metal Trades Councils. Their objective is to encourage such local council organizations to adjust trade disputes along practical lines as they arise and thus establish and encourage more harmonious relations between employers and employees.[2]

Article VII of § 1 of the constitution of the Metal Trades Department provides:

"Where there exist three (3) or more local unions of affiliated trades in any locality, *they shall, when called upon by their respective national and international organizations*, form a local metal trades council of this Department, which bodies shall be governed in accordance with the laws of this Department." (italics added).

The New London council had been certified by the NLRB as the bargaining representative for 11 unions at the Electric Boat Division of General Dynamics, in Groton, Connecticut; there were two additional unions separately certified. The council represented approximately 8,000 production workers, of which about 400 were members of Local 1302 and were employed in various carpentry crafts. Its charter was originally issued on January 8, 1945, and it had continuously performed its function to the present date. The two separate bargaining units certified at the Electric Boat, included the "foundry workers," consisting of about 20 members; and the Marine Draftsmen's Union.

---

1. Article VII, § 6 of the constitution and by-laws of the Metal Trades Department, filed August 1, 1969.

2. Articles I and II of the constitution and by-laws of the Metal Trades Department, filed August 1, 1969.

On August 11, 1967, the plaintiff Local 1302 voted to instruct its executive board to take the necessary legal steps to disaffiliate from the council and obtain permission for a separate certification, as its own bargaining representative. Such an authorization would empower the Local 1302 to deal directly with the employer, Electric Boat, and negotiate its own future collective bargaining contracts. Pursuant to the foregoing vote of its membership on March 8, 1968, the plaintiff severed relations with the Metal Trades Council and on March 13, 1968, notified the employer of its action. Local 1302 was supported not only by its own unit, but also by the Connecticut State Council of Carpenters with which it was affiliated. Its effort for separate certification was given moral support by the Providence, Pawtucket, and Central Falls, Rhode Island, Carpenters' District Council, because a number of their members worked at Electric Boat and agreed with the proposed action.

The defendant International on March 29, 1968, notified the plaintiff Local to refrain from filing the severance petition with the NLRB. But on April 4, 1968, in complete disregard of the International's request or directive, the plaintiff Local did petition the Labor Board for a separate certification under the Act. On April 24, 1968, the defendant parent International Union, after holding a hearing and complying with the provisions of its constitution and by-laws, appointed Richard P. Griffin as "supervisor or trustee" over the affairs of the local union. He thereupon suspended the autonomy of the local union so that it could not carry on union business under its own control, and withdrew the Local's petition for disaffiliation from the council, which was pending before the NLRB.

The collective bargaining agreement at Electric Boat had expired at about that time and the union production workers were engaged in a strike. The Metal Trades Council proceeded to negotiate a new contract with an expiration date of July 1, 1972. The new contract was approved by a majority vote of all the workers represented by the council.[3]

The conditions under which a parent union may intervene in the affairs of a local and impose a trusteeship are set out in the International's constitution.[4] These reasons include the following: (1) to correct financial irregularities;

3. Defendant's Exhibit #1; see Plaintiff's Exhibit "B".

4. Paragraph D, section 6 provides:
   "The United Brotherhood of Carpenters and Joiners of America shall have the right to establish supervision over and to conduct the affairs of any subordinate body (including the removal of any or all officers of such subordinate body) to correct financial irregularities or to assure the performance of collective bargaining agreements and the responsibility of the subordinate body as a bargaining agent or to protect the interests and rights of the members or whenever the affairs of the subordinate body are conducted in such a manner as to be detrimental to the welfare of the members and to the best interests of the United Brotherhood, subject, however, to the provisions of Paragraph J of Section 10."
   The qualification referred to above in Paragraph J of section 10 provides:
   "Whenever it appears to the satisfaction of the General President that any Local Union or member thereof, or any District, State or Provincial Council is acting contrary to the welfare of the United Brotherhood of Carpenters and Joiners of America, or that supervision should be established over the conduct of the affairs of any subordinate body as set forth in Section 6-D, he may appoint a committee to hold a hearing, after due notice to such subordinate body or member. Upon completion of the hearing, the committee shall report its findings and recommendations to the General Executive Board and to the member or subordinate body involved. The General Executive Board is empowered to take such action as is necessary and proper for the welfare of the United Brotherhood of Carpenters and Joiners of America, subject, however to the right of appeal to the next General Convention."

(2) to assure the performance of collective bargaining agreements and the responsibility of the subordinate body as a bargaining agent; (3) to protect the interests and rights of the members; (4) wherever the affairs of the subordinate body are conducted in such a manner as to be detrimental to the welfare of the members and to the best interests of the United Brotherhood. It would appear that only item (4) could be applicable to any prospective action of the Local, should it again request disaffiliation.

The constitution and by-laws of the United Brotherhood do not require that this local union must affiliate with the council. Section 62 thereof provides:

". . . (I)t is the duty of all Local Unions to affiliate with the appropriate Central, State and Provincial (Canada) Bodies. . . ."

However, there is a requirement for affiliation in the constitution of the Metal Trades Department of the American Federation of Labor and Congress of Industrial Organization. The latter organization is a separate entity, with its own officers, executive council, and national convention. Article VII § 1 of the latter constitution provides:

"Where there exist three or more local unions of affiliated trades in any locality, they shall when called upon by their respective national and international organizations, form a local metal trades council of this Department which bodies shall be governed in accordance with the laws of this Department."

The defendant International represents that it followed all of the procedures required by its constitution and by-laws, in imposing the trusteeship over the Local. Pursuant to the direction of the general executive board under paragraph J, § 10, the committee appointed by the International's president held a hearing in New London on April 11, 1968. Timely notice was given to the plaintiff union advising it that all officers were requested to appear and any individual members had the right to appear and offer testimony if they wished to do so.

The hearing notice disclosed that Local 1302 had refused to comply with the directive sent on March 29, 1968, ordering it to refrain from filing the Labor Board Petition, withdraw its letter of severance from the Metal Trades Council and continue its affiliation. The action of the Local in withdrawing from the Metal Trades Council and seeking its own separate bargaining unit, was claimed to seriously jeopardize the collective bargaining negotiations, which were then going on with the company. The defendant also indicated that the Local's filing a petition for separate representation would not assure proper performance by the Local of its responsibility as the bargaining representative for its members at Electric Boat.

At the conclusion of the hearing, the committee found that collective bargaining by the Metal Trades Council, on behalf of Local 1302 and the other affiliated local unions had in the past resulted in a consistently stable bargaining relationship, under which members of the plaintiff Local and the other local unions affiliated with the council had received substantial benefits from their representation by the council. It also found that the Local's filing of the petition with the NLRB seeking separate unit representation had resulted in postponement and delay in the collective bargaining sessions, which had already commenced on or about April 1, 1968. It found that the proposed disaffiliation move would not only have a detrimental effect on the collective bargaining process, but that it also constituted a failure to carry out its duties in a responsible manner as the collective bargaining representative of Local 1302. It then proceeded to recommend on April 24, 1968, the imposition of a supervisor-trustee for the plaintiff Local. The recommendation was effected on May 2, 1969 by the general executive board of the defendant International Union.

After the supervisor-trustee withdrew the plaintiff's petition before the NLRB

on June 4, 1968, Local 1302 appealed the decision, but said appeal was denied. Thereupon, a new collective bargaining agreement was entered into between the Metal Trades Council and Electric Boat, which does not expire until June 30, 1972. This new contract was ratified by a majority of the overall union membership of the entire group of affiliated unions in the council. When this had been accomplished, the defendant International then terminated the trusteeship.

The plaintiff now represents that the sole purpose of the International's imposing the trusteeship in the first place was to prevent the Local from seeking disaffiliation from the Metal Trades Council and its own separate Board certification, as the sole bargaining representative of its members. The plaintiff now claims that the defendant's purpose in imposing the supervisor-trustee was unlawful and not consistent with the purposes expressed in the Landrum-Griffin Act.

The current contract expires June 30, 1972, and new negotiations are contemplated in the immediate future seeking a renewal of the contract. The defendant International made it clear, that if the plaintiff should re-file a new petition with the NLRB requesting disaffiliation (Tr. 26–27), it would immediately re-impose a trusteeship and withdraw the petition.

The plaintiff's position is that if this action were permitted to go unchallenged, the International would have absolute power to determine what labor policies affecting local unions could be considered by the NLRB. This dictatorial action could completely frustrate the intended quasi-judicial purpose of the Board's authority to hear, supervise, and adjudicate labor disputes, including bargaining unit certification.

The defendant argues that any trusteeship imposed in accordance with the procedures set out in the International's constitution, carries with it a

statutory presumption of validity for a period of 18 months from the date of its establishment. 29 U.S.C.A. § 464(c). This statutory rule has no relevancy here, until it has been first established that the trusteeship is presently existing and is in conformity with the powers authorized under the constitution and by-laws of the International Union:

"(I)t is quite clear from the statute itself and from the legislative history that Congress intended for the presumption of validity to be available only where the trusteeship has been established '. . . in conformity with the procedural requirements of its (the labor organization's) constitution and bylaws and authorized and ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or by-laws . . . .' 29 U.S.C.A. § 464 (c); 2 U.S.Code Cong. & Adm.News, 86th Cong., 1st Sess. 1959, p. 2334." United Bhd. of Carpenters and Joiners of America v. Brown, 343 F.2d 872, 883 (10th Cir. 1965), 59 LRRM 2140, 2148.

However, no actual trusteeship is presently in effect and no statutory presumption of legality carries over to any prospective trusteeship not yet imposed. The remedies related to any past action of the International in this case have been declared moot; and the Court is concerned only with the threatened future action of the International, which it finds to be real and immediate. When Local 1302 files its new petition with the NLRB, such action must be commenced not earlier than 90 days, nor less than 60 days prior to the existing contract termination date, July 1, 1972.[5] Hence, the final date to effect such action must not be later than May 1, 1972; and the time element becomes pressing.

The defendant's position is that once an affiliated union joins the Metal Trades Council, it becomes perpetually

---

5. Leonard Wholesale Meats, Inc., 136 NLRB No. 103, 49 LRRM 1901; *also see,* Deluxe Metal Furniture Co., 121 NLRB No. 135, 42 LRRM 1470, and Kimco Auto Products, Inc., 183 NLRB 109.

locked-in and married for life by the very nature of the council's structure. (Tr. 30). It explains that this becomes necessary, because it is wholly impractical for an employer to effectively negotiate fourteen separate contracts within the limited period of time available for negotiations. Multiple successive strike actions would be likely to follow and cause severe financial losses to the labor force as well as a costly disruption of the employer's business. The defendant International suggests that to "carve out" individual unions from the council will destroy the economic stability of the industry, which is essential to good employee-employer relations. The likelihood of this result is especially true, where multiple independent unions exist in one industrial-type plant like Electric Boat. The practical common sense of the defendant's argument presents very persuasive considerations, but the threshold question to be decided by the Court is in what forum should these issues ultimately be decided.

### Issue

The question presented is whether or not the threatened imposition of a supervisor-trusteeship by the International against the Local is for a lawful purpose; and if not, should injunctive relief be granted to prohibit the defendant's interference with the plaintiff's filing a disaffiliation petition with the NLRB, together with a request for separate certification and recognition as the unit's sole bargaining agent.

### Discussion of Law

Subchapter II of the National Labor Relations Act confers primary authority upon the Labor Board to certify which organization shall be recognized as the exclusive bargaining representative for an identifiable group of employees wishing to negotiate a collective bargaining contract.

> "There can be no doubt as to the breadth of the Board's power and discretion to select the appropriate bargaining unit for the employees in each case. The determination rests in the sound discretion of the Board and will not be disturbed unless it is arbitrarily and unreasonably exercised." NLRB v. Pittsburgh Plate Glass Co., 270 F.2d 167, 173 (4th Cir. 1959), cert. denied, 361 U.S. 943, 80 S.Ct. 407, 4 L.Ed.2d 363.

See: NLRB v. Industrial Rayon Corp., 291 F.2d 809 (4th Cir. 1961)

■ One of the duties of the Board is to determine expeditiously, not only whether a particular group of employees desires to be represented by the union, but which unit should be the lawful agent to negotiate their agreement "in order to promote the purposes of the act." Congress has clothed this quasi-judicial agency with jurisdiction to review and establish a national labor policy governing all employer-employee controversies affecting commerce. The courts in turn have proceeded to fashion a body of federal labor law to effect a judicial interpretation and supplement the enforcement of these statutory laws. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1956).

Title 29, U.S.C.A. § 159 sets out in express language those powers conferred upon the Board to determine which union bargaining unit should be recognized. That statute reads in part as follows:

> "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ."

> "(b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ."

"(c) (1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

"(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a) of this section, or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a) of this section . . . .

.    .    .    .    .    .

"(c) (5) In determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling."

■ The overriding policy of the law requires that the employees be represented by agents of their own choosing. An essential corollary requires that those same employees shall retain the right to request disaffiliation from or the decertification of their bargaining unit, should they conclude that its representation is inadequate, ineffective, or not serving their interests. Constitutional rules and by-law limitations of the union are designed to provide for contract responsibility and an orderly continuity of the collective bargaining relationship. However, if the International were to have the power to impose a trusteeship over a local, whenever it unilaterally decided the membership's action was detrimental, either to the local or its own best interests, it could effectively bar the filing of a decertification or disaffiliation petition "at will." If this approach were sustained, the Board's statutory jurisdiction would be limited and its public purpose effectively destroyed.

" . . . (W)e must remember that a majority of the local membership consistently voted against having anything to do with the District Council and on at least two occasions, by secret ballot, voted against the proposal to raise the monthly dues. We must also remember that the provisions of 29 U.S.C.A. § 411 were designed to afford them protection in that respect. Under these circumstances, we have no hesitancy in holding that the purposes for which this trusteeship was imposed do not fall within any of the categories set forth in section 302. Beyond question, they do not come under the category of correcting corruption of financial malpractice and have nothing whatever to do with collective bargaining. It is also clear to us that the specified purposes are not within the category of restoring democratic processes or otherwise carrying out the legitimate objects of United Brotherhood. To the contrary, the imposition of the trusteeship in question could have no other effect than to stifle democratic processes by, in effect, voiding the results of the properly conducted elections on the issues involved. If we were to hold that the asserted purposes were proper, this court would be placed in the position of allowing a national union to establish a trusteeship over a local union because the members of the local union insisted upon exercising a right granted them by statute. This would in effect nullify and frustrate not only the plain purpose but the express terms of the Act." United Bhd. of Carpenters and Joiners of America v. Brown, *supra*, 343 F.2d at 883.

■ The defendant would distinguish this case from *Brown*, on the grounds that paragraph J, § 10 of the International's constitution has been amended since that decision. It represents that the amended constitution authorizes the imposition of a trusteeship, "*whenever the affairs of the subordinate body are*

*conducted in such a manner as to be detrimental to the welfare of the members and to the best interests of the United Brotherhood."* Title 29, U.S.C.A. § 462, however, specifically spells out the named conditions which might justify the imposition of a trusteeship:

"Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and by-laws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization."

The International's constitution should be interpreted, so as not to conflict with the Act, if it is possible to do so; but, in the last analysis, the law must control. The affiliation of multiple craft unions into the Metal Trades Council has parallel similarity to a system of plantwide bargaining. The latter type organization ordinarily comprises several related craft unions. Grievances commonly arise between the competing groups and the National Labor Relations Board is then called upon to determine, which unit's bargaining power should be most appropriately certified to carry out the purposes of the Act.

In Mallinckrodt Chemical Works, 64 LRRM 1011, 162 NLRB, No. 48, the Board reversed its previous position in American Potash & Chemical Corporation, 33 LRRM 1380, 107 NLRB 1418, and stated:

"Shortly after the enactment of Section 9(b) (2), the Board, in the National Tube case dismissed a craft severance petition filed on behalf of a group of bricklayer craftsmen who were employed in the basic steel industry. After an exhaustive analysis· of the section and its legislative history, the Board concluded that: '(1) the only restriction imposed by Section 9(b) (2) is that a prior Board determination cannot be the basis for denying separate representation to a craft group; (2) under the language of the statute there is nothing to bar the Board from considering either a prior determination or the bargaining history of a particular employer as a factor, even if not controlling, in determining the appropriateness of a proposed craft unit; (3) there is nothing in either statute or legislative history to preclude the Board from considering or giving such weight as it deems necessary to the factors of bargaining history in an industry, the basic nature of the duties performed by the craft employees in relation to those of the production employees, the integration of craft functions with the overall production processes of the employer, and many other circumstances upon which the Board has customarily based its determination as to the appropriateness or inappropriateness of a proposed unit.' The bricklayer unit was there found to be inappropriate because of the existence of such a pattern and history of bargaining in the basic steel industry and because the functions of the craft bricklayers were intimately connected with the basic steel production process which was highly integrated in nature." (footnote omitted)

It might well be that after a hearing, the plaintiff Local 1302 could experience an unfavorable result before the NLRB; but whatever the final decision, the Board's jurisdiction to hear the issue cannot be avoided, by the International's dictatorial or arbitrary imposition of a trusteeship.

"The Board was right . . . (in the National Tube decision) in reaching the conclusion that the addition of subsection 2 of § 9(b) created no ambiguity. As amended, § 9(b) does not strip the Board of its original power and duty to decide in each case what bargaining unit is most appropriate . . . . In effect it frees the Board

from the domination of its past decisions and directs it to re-examine each case on its merits and leaves it free to select that unit which it deems best suited to accomplish the statutory purposes . . . . Congress clearly did not command the Board, as it could have done, to establish a craft bargaining unit whenever requested by a qualified craft union, or relieve the Board of its duty to consider the interests of the plant unions and wishes of the employees who desire to bargain on a plantwide basis. The amended section expressly requires the Board to decide in *each case* what unit would be most appropriate to effectuate the overall purpose of the Act to preserve industrial peace." NLBR v. Pittsburgh Plate Glass Co., *supra*, 270 F.2d at 172–173 (quoted in Mallinckrodt Chemical Works, *supra*, 64 LRRM at 1015).

" . . . (W)e shall, as the Board did prior to American Potash, broaden our inquiry to permit evaluation of all considerations relevant to an informed decision in this area. The following areas of inquiry are illustrative of those we deem relevant:

"1. Whether or not the proposed unit consists of a distinct and homogeneous group of skilled journeymen craftsmen performing the functions of their craft on a nonrepetitive basis, or of employees constituting a functionally distinct department, working in trades or occupations for which a tradition of separate representation exists.

"2. The history of collective bargaining of the employees sought and at the plant involved, and at other plants of the employer, with emphasis on whether the existing patterns of bargaining are productive of stability in labor relations, and whether such stability will be unduly disrupted by the destruction of the existing patterns of representation.

"3. The extent to which the employees in the proposed unit have established and maintained their sepa-

rate identity during the period of inclusion in a broader unit, and the extent of their participation or lack of participation in the establishment and maintenance of the existing pattern of representation and the prior opportunities, if any, afforded them to obtain separate representation.

"4. The history and pattern of collective bargaining in the industry involved.

"5. The degree of integration of the employer's production processes, including the extent to which the continued normal operation of the production processes is dependent upon the performance of the assigned functions of the employees in the proposed unit.

"6. The qualifications of the union seeking to 'carve out' a separate unit, including that union's experience in representing employees like those involved in the severance action.

" . . . . Our determinations will be made only after a weighing of all relevant factors on a case-by-case basis, and we will apply the same principles and standards to all industries." Mallinckrodt Chemical Works, 64 LRRM 1011, at 1016–17. (footnotes omitted).

It should be emphasized here, that when the plaintiff Local first affiliated with the Metal Trades Council of New London, no International pressure motivated its decision to join and no irrevocable commitment was ever made or sought. Its affiliation with the council was considered to be mutually advantageous at that time. No mention was made in the International's constitution, that should the Local decide to disaffiliate, its local autonomy could be suspended and a supervising trustee imposed to deny it such a freedom.

" . . . Thus, the rights of individual members of a labor union are protected by federal statute with a view to allowing those members to conduct local matters with a minimum of outside interference. In short, local affairs are to be governed by local mem-

bers under democratic processes." United Bhd. of Carpenters and Joiners of America v. Brown, *supra,* 343 F.2d at 883.

Paragraph J, § 10 and paragraph D, § 6, of the International's constitution provide in part, that whenever the affairs of the subordinate body are conducted in such a manner as to be detrimental to the welfare of the members and to the best interests of the United Brotherhood, it shall have the right to establish supervision over the affairs of that subordinate body. This vague delegation of power to the International is too broad and nebulous, when confronted with the Local's right to its own autonomy and right to maintain responsible self-government.

" . . . (T)he courts should be very slow to inject themselves into the day-to-day administration of a labor union. This has been well said by Archibald Cox, who was former Solicitor General of the United States, but before that was Chief advisor to Senator Kennedy at the time the Landrum-Griffin Act was under consideration. Mr. Cox says:

"The initial suspension of local self-government is usually justified by the needs of the organization, and it would unreasonably impair the independence of the labor movement to allow much scope at this point for the Government to review the judgment of union officials as to the needs of the organization or the best means of effectuating them." Foose v. Hoffa, 63 LRRM 2436, 2440 (C.D.Cal.1966).

The statutory jurisdiction conferred by Congress upon the National Labor Relations Board authorizes it to hear and decide disputes arising out of the certification of union representation. Such employee group action is protected by law, because it has been deemed to be an interest within the public domain. It cannot be destroyed at will by the private contract of the parties nor by structured controls within the union's constitution or by-laws. Should either alternative be permissible, the union's power of self-interest would be elevated above that of the public welfare.

" . . . The legislative history of section 302 of the Act (29 U.S.C.A. § 462) clearly discloses an intent on the part of Congress ' . . . that there should be a "limitation on the right of internationals to place local unions in trusteeship" ' and one of those limitations was that ' . . . the trusteeship must conform to the constitution and bylaws of the labor organization.' 2 U.S.Code Cong. & Adm.News, 86th Cong., 1st Sess., 1959, pp. 2333–2334. . . . It requires at the very least that the organization's constitution and bylaws set forth the circumstances under which a trusteeship may be established over its local unions and the manner or procedure in which it is to be imposed. It goes without saying, of course, that the constitution and bylaws in that respect must not conflict with applicable provisions of the Act." United Bhd. of Carpenters and Joiners of America v. Brown, *supra,* 343 F.2d at 882.

The Congress wisely imposed this administrative duty to certify union representation upon the NLRB, not the courts, 29 U.S.C.A. § 159. That Board has the expertise born of experience, to competently evaluate all the relevant factors in arriving at an informed decision. This Court has not heard the factual circumstances here, which motivated the Local's disaffiliation petition, nor should it.

" . . . As for the cases which, in general, warn courts to abstain from meddling with arbitration awards, they are inapplicable to the Board (NLRB) which, unlike the courts, is charged with vindicating a body of public rights set forth in the National Labor Relations Act." Lodge 743, IAM, A.F.L.–C.I.O. v. United Aircraft Corp., 337 F.2d 5, 10–11 (2d Cir. 1964).

The Court grants that part of the plaintiff's prayer for relief, which requests the granting of a permanent injunction ordering the defendant Interna-

tional Union, its general executive board, its officers, representatives, agents and servants from interfering with or otherwise restricting the plaintiff Local in the legitimate conduct of its affairs; and more specifically, from interfering with the plaintiff Local's taking all necessary steps to lawfully place before the NLRB for consideration and hearing a new petition for disaffiliation of Local 1302 from the Metal Trades Council and a petition for a separate certification pursuant to the National Labor Relations Act. The defendant International shall be enjoined from imposing a supervisor-trusteeship to prevent the plaintiff from attempting to accomplish these purposes.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court pursuant to Rule 52(a), Fed.R.Civ.P.

The parties shall file a proposed order within ten (10) days; and judgment shall enter accordingly. So ordered.