535 F.2d 180
 92 L.R.R.M. (BNA) 2251, 78 Lab.Cas. P 11,433
 AMERICAN CAN COMPANY, Petitioner,
and
United Steelworkers of America, AFL-CIO, Intervenor,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
LOCAL ONE, AMALGAMATED LITHOGRAPHERS OF AMERICA,
INTERNATIONAL TYPOGRAPHICAL UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
American Can Company, Intervenor.
 Nos. 482, 570, 883, Dockets 75-4099, 75-4126, 75-4139.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 20, 1976.
Decided April 27, 1976.
 
 Albert X. Bader, Jr., New York City (Simpson Thacher & Bartlett, Martin H. Zuckerman, New York City, and James S. Frank, Brooklyn, N. Y., on the brief), for petitioner American Can Co.
 James F. Gill, New York City (Robinson, Silverman, Pearce, Aronsohn, Sand & Berman, New York City, Peter B. O'Connell, on the brief), for petitioner Local One.
 David L. Gore, Pittsburgh, Pa. (Bernard Kleiman, Chicago, Ill., on the brief), for intervenor United Steelworkers of America.
 David A. Fleischer, Atty., Washington, D. C. (John S. Irving, Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John Ferguson, Atty., Washington, D. C., on the brief), for respondent National Labor Relations Board.
 Before FEINBERG, OAKES and VAN GRAAFEILAND, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 In these proceedings, the National Labor Relations Board found that the American Can Company had violated the National Labor Relations Act by recognizing the United Steelworkers of America, AFL-CIO as the bargaining representative of certain lithographic employees at a new plant and by applying to them the union security clause in the Steelworkers' contract. The Board also found that the Company had not violated the Act when it refused to recognize Local One, Amalgamated Lithographers of America, International Typographical Union, AFL-CIO ("ALA") as the bargaining representative of these employees. 218 N.L.R.B. No. 17. In these consolidated cases, the Company and ALA petition for review of the Board's order and the Board cross-appeals for enforcement. Although the Company treats this case as though the Board has created new and broadly significant precedent, we do not so regard it. Confining the issues to the record before us, we deny the petitions for review and enforce the Board's order without modification.I. Facts
 
 
 2
 For many years, the Company has operated a number of plants in the United States and Canada at which it manufactures metal containers. One of these plants was located in Jersey City, New Jersey ("the Hudson plant"). At the peak of production there, the Hudson plant manufactured more than a billion containers a year of all sizes and shapes. The plant consisted of eight buildings, each several stories high, with more than a million square feet of floor space. In August 1972, the Hudson plant had approximately 1,800 employees, including 54 lithographic production workers.
 
 
 3
 At that time, the Company notified all employees at Hudson that it, along with various other company plants, would be shut down within 18 months. Five unions, including the Steelworkers and ALA, then represented various groups of employees at the Hudson plant. In December 1972, the Company announced that it was going to open a new can-making facility in Edison Township, New Jersey ("the Regency plant"), which would eventually employ about 250 people. The Regency plant location was about 26 miles from the Hudson plant. Hudson employees were invited to apply for positions at the new plant.
 
 
 4
 In January 1973, in conversations and in documents, the Company and ALA expressed their positions regarding the shutdown at Hudson and its effect on ALA members employed at that plant. Since an overwhelming majority of the latter, according to ALA, wanted to work at Regency and to continue there to be represented by ALA, it sought recognition as the bargaining representative of lithographic employees at the Regency plant. A letter from Edward Hansen, an ALA official, and a petition signed by all ALA employees at Hudson, which incorporated these views, were given to the plant manager at Hudson, who turned them over to Henry Ries, general supervisor of employee relations. The Company's position was that Regency was a new operation rather than a relocation of Hudson, that ALA's contract, then due to expire on May 1, would not apply to Regency, and that the Company would prefer that Regency be unorganized, but if organized, that the employees there be included in a single unit. More correspondence ensued, in which the Company made clear that it would bargain with ALA for a new contract covering the Hudson plant but that ALA had not established its right to represent any Regency employees. In April, the Company and ALA negotiated a new contract for Hudson,[1] but the agreement did not refer to the closing of the Hudson plant or to employment of lithographic employees at Regency. Shortly after negotiations, however, Hansen asked a high-level company official whether it had changed its position regarding Regency and received a negative response. There was no further direct contact between ALA and the Company on this question until March 4, 1974.
 
 
 5
 Meanwhile, on July 7, 1973, the Regency plant opened. It was much smaller, more modern and more specialized than Hudson. It consisted of one building, one story high, with approximately 263,000 square feet of floor space. Only aerosol cans were manufactured there. On August 23, 1973, the Steelworkers filed a petition for an election at Regency in a proposed unit of all production and maintenance employees.[2] At that time, 64 of the expected 250 employees were working in 16 of the expected 26 job classifications at the plant, but no lithographers were employed. On September 10, the Board's Regional Director approved a stipulation between the Steelworkers and the Company for a consent election and an election was scheduled for September 21.
 
 
 6
 ALA found out about the election a few days before it was to be held, and on September 20, hand-delivered a letter to the Board's Regional Office, which stated:
 
 
 7
 Just learned of representation election scheduled for September 21st at American Can, Pierson Avenue, Edison, New Jersey. We object to any inclusion of lithographic workers in whom we have an interest and who do not properly belong in plant-wide unit.
 
 
 8
 A Board agent then called Mr. Ries, who by now was general supervisor of employee relations at the Regency plant, and asked him whether he "personally knew of any interest on behalf of the ALA in the election." Although Ries some eight months before had seen Hansen's letter and the petition signed by all the lithographers at Hudson, he answered "No." Ries added that "any of these transactions were handled by our Greenwich people," and suggested that the Board agent "call Greenwich" (company headquarters). Nothing in the record indicates that the agent pursued the inquiry.
 
 
 9
 The scheduled election was held the next day, and the Steelworkers won by a vote of 84 to 0. ALA was not on the ballot and no lithographers voted, none having yet been hired at Regency. On September 28, ALA filed unfair labor practice charges, alleging that the Company had refused to bargain at both the Hudson and Regency plants and had unlawfully assisted the Steelworkers at Regency. On October 1, the Regional Director certified the Steelworkers as bargaining representative of the Regency production and maintenance employees. Thereafter, the Company and the Steelworkers applied their national agreement to Regency, including a traditional union security provision. Thus, in October, when the Company offered employment at Regency to five lithographic employees at the still-operating Hudson plant, the Company conditioned the offer on their joining the Steelworkers and accepting the wage rates and benefits of the Steelworkers' contract, which were less attractive than those in the ALA contract. The five employees refused to work at Regency except under an ALA contract.
 
 
 10
 On March 4, 1974, ALA reiterated its earlier position that its contract covered lithographic employees at Regency and requested recognition as bargaining representative of the four lithographers then employed there. The following day, ALA filed new unfair labor practice charges, alleging that the Company had violated the Act by refusing to recognize ALA as the bargaining representative of lithographic employees at the Regency plant and by refusing to hire lithographers at that plant unless they joined the Steelworkers. On May 21, 1974, eight days before the hearing on the unfair labor practice charges, ALA for the first time specifically requested in writing that the Company bargain over the effects on the remaining lithographic employees at Hudson of the phasing out of operations there. On May 24, the Company responded that it was, and always had been, willing to discuss that matter with ALA at a mutually convenient time.
 
 II. The Board's decision
 
 11
 The Board found that because the Regency plant was a new plant, not a relocation of the Hudson plant, the Company did not violate sections 8(a)(5) and (1) of the Act by refusing to recognize ALA as the representative of the lithographers at Regency. The Board also found that the Company had not refused to bargain with ALA concerning the effects on the lithographers at Hudson of the closing of that plant. In these respects, the Board agreed with the Administrative Law Judge, who had concluded not only that ALA had no right to compel the Company to recognize it as the representative of lithographers at Regency but also that ALA had "waived its rights to bargain about the effects on Hudson employees of that plant's closing." These are the portions of the Board's order and decision that ALA petitions to review.
 
 
 12
 The Board also found, contrary to the Administrative Law Judge, that when the Company recognized the Steelworkers as the bargaining representative of all employees at Regency, a real question concerning representation existed with respect to the lithographic employees there. The Board reasoned, in part, as follows:
 
 
 13
 (W)e find that on the basis of the ALA's long history of bargaining for lithographic production employees in a separate unit at the Hudson plant the transfer of part of the operations at the Hudson plant to the Regency plant, including some of the lithographic production work, the transfer of some of the lithographic equipment from the Hudson plant to the Regency plant, and the expected offer of employment at the Regency plant to some of the lithographers employed at the Hudson plant, together with the ALA's repeated claim to represent lithographic production employees at the Regency plant, created a real, substantial question concerning the representation of these employees. Instead of submitting to the Board the question of which Union was entitled to represent the Regency plant lithographic production employees, Respondent sought to resolve the question itself with the cooperation of the Steelworkers by utilizing the Board's processes while withholding vital information from the Regional Office personnel. Undoubtedly, if Respondent had reported the ALA's interest and claim, as it was dutybound to do, no election would have been held and no certification would have issued until the unit placement of lithographic production employees at the Regency plant had been resolved. Apparently it was to avoid this very possibility that information as to the ALA's claim of representation was withheld. (Footnotes omitted.)
 
 
 14
 Consequently, the Board found that the Company had violated sections 8(a)(2) and (1) of the Act by recognizing the Steelworkers, and sections 8(a)(1), (2) and (3) by applying the union security clause of the Steelworkers' contract to lithographic employees. See Midwest Piping and Supply Co., 63 N.L.R.B. 1060 (1945). The Board's order, among other things, required the Company to withhold recognition from the Steelworkers as bargaining representative of the lithographic employees at the Regency plant until certification by the Board and to reimburse present and former lithographic employees at the Regency plant for initiation fees, dues and other monies which they had paid under the union security clause. The order did not provide for any back-pay liability. The Company, supported by the Steelworkers, petitions to review this portion of the Board's order.
 
 III. ALA's petition to review
 
 15
 ALA contends that the Board erred in concluding that the Company did not violate sections 8(a)(5) and (1) of the Act by refusing to recognize and bargain collectively with ALA as the bargaining representative of lithographic production employees at Regency. ALA argues that such recognition was required because Regency was merely a relocation of the Hudson plant and, but for the Company's unlawful application of the Steelworkers' contract to lithographers at Regency, a majority of those employees would have been ALA members from Hudson.
 
 
 16
 On this aspect of the case, the Board without further discussion affirmed the decision of the Administrative Law Judge "for the reasons stated by him." These were that Regency "was not a simple removal of Hudson to a new location" but was, in effect, a "new facility" at which the Company had "no absolute or automatic obligation" to recognize ALA, that the Company had not committed an unfair labor practice in refusing to do so, and that the Company did have an obligation to bargain with ALA "about the effects on Hudson employees of that plant's closing," but, on that issue, ALA had waived its rights.
 
 
 17
 We believe that there was substantial evidence in the record to support the Board's findings and that its legal conclusions were not incorrect. On the crucial issue of whether Regency, or more particularly the lithographic department there, was merely a continuation of the Hudson operation, the Administrative Law Judge noted that Regency was limited to a single product while at Hudson "a wide range of products" had been manufactured, that both the total work force and the lithographic component at Regency were much smaller than at Hudson, that much of the supervisory staff at Hudson was transferred elsewhere and that only part of the machinery at Hudson was physically moved to Regency. True, there was also evidence from which a contrary finding on this key issue could arguably have been made and ALA points to it in its brief.[3] But we cannot substitute our judgment for that of the Board on this question. See NLRB v. Hudson Berlind Corp., 494 F.2d 1200, 1202-03 (2d Cir.), cert. denied, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974).
 
 
 18
 The Administrative Law Judge recognized that even though the Company was not required to recognize ALA as the bargaining agent for lithographers at Regency because that plant was not a continuation of the Hudson operation, the Company was still required to bargain with ALA regarding the effect on Hudson lithographers of the closing there. However, ALA did not specifically request bargaining on this issue until May 21, 1974, two months after the Regional Director issued his complaint on the ALA charges and only eight days before the hearing. The Company immediately replied that it was willing to discuss the matter. Prior to that time, ALA had long been aware of the Company's decision to close Hudson and to open Regency. ALA had even negotiated a new contract with the Company at Hudson without dealing with the issue of the effect of the closing on the Hudson lithographers. On these facts, the Administrative Law Judge's finding of waiver was more than justified. See NLRB v. Spunjee Corp., 385 F.2d 379, 383-84 (2d Cir. 1967). There is no basis, therefore, for concluding that the Company failed to fulfill its bargaining obligation to ALA at Hudson and that this prevented ALA from achieving majority status at Regency.[4]
 
 IV. The Company's petition to review
 
 19
 The Board found that when the Company recognized the Steelworkers as the bargaining representative of lithographic employees at Regency, a real question concerning representation existed. Therefore, according to the Board, the Company violated sections 8(a)(2) and (1) of the Act by according such recognition and sections 8(a)(1), (2) and (3) of the Act by applying the union security clause of the Steelworkers' contract to lithographic employees. The Company, supported by the Steelworkers, vigorously contests this portion of the Board's order, claiming that this case is another Board attempt to extend unjustifiably the doctrine of Midwest Piping and Supply Co., supra, despite numerous rebuffs from various circuit courts of appeals.[5] As will be seen below, we view the case somewhat differently and believe that on these unusual facts, the Board's order should be enforced.
 
 
 20
 In Midwest Piping, two unions sought to represent the same unit of employees. Faced with valid representation petitions by the two unions, the employer nevertheless voluntarily recognized one of them without attempting to determine its majority status by using Board processes. The Board found the employer had committed an unfair labor practice. Briefly summarized, the Midwest Piping doctrine requires an employer to withhold recognition when a real question concerning representation exists. In NLRB v. Hudson Berlind Corp., supra, we noted that "we have approved (the doctrine) on several occasions," 494 F.2d at 1202,[6] and in that case we enforced a Board order that had applied it.
 
 
 21
 The key question in applying the doctrine is whether there is a real question concerning representation. The conflict between the Board and some courts of appeals, see note 5 supra, has generally arisen where two unions each claim to represent a majority of employees already working in a particular unit. The court in Playskool, Inc. v. NLRB, 477 F.2d 66 (7th Cir. 1973), summarized the difference between the Board's approach in such situations and that of the courts that have rejected it as follows:
 
 
 22
 The Board looks first to the support held by the minority union and finds a "question concerning representation" if the claim of that union is "not clearly unsupportable"; the courts look first to the support held by the majority union and find that no "question concerning representation" exists if that union has the validly-obtained support of an employee majority and the rival union is thus shown to be "no genuine contender."
 
 
 23
 477 F.2d at 70 n.3.
 
 
 24
 Thus, courts have rejected the Board's view of Midwest Piping where one union has shown that it represents a majority of the workers in the contested unit, even though another union has some support. That is not the case here. When the Company recognized the Steelworkers as the representative of lithography workers at Regency, there had been no showing that the Steelworkers represented a majority of those workers. Indeed, no lithography workers had even been hired. Cases holding that no "real question concerning representation" exists when there has been a showing of majority support for one union by employees already working are not controlling here.[7]
 
 
 25
 In Hudson Berlind Corp., supra, we made clear that in determining the existence of a question of representation the Board could examine factors other than the numerical strength of the contending unions.[8] In that case, the employer merged two facilities to form a new plant and then, prior to transfer of any work to the new plant, recognized the union representing employees from the larger of the prior units. We held that there was sufficient evidence to support the Board's finding that there was a real question concerning representation even though the local union recognized had had 31 members in its old unit and the complaining local had had only ten. We concluded that "this numerical superiority was not sufficiently predominate to remove any real question concerning representation" because, on the facts of that case, "it was not clear how many employees would choose to transfer" from the old units to the new one. 494 F.2d at 1203. See also Oil Transport Co. v. NLRB, 440 F.2d 664 (5th Cir. 1971). Cf. also Cooper Thermometer Co. v. NLRB, 376 F.2d 684 (2d Cir. 1967).
 
 
 26
 We believe that a similar examination of all the facts is appropriate here, and supports the result reached by the Board. ALA had a 30-year history of representing lithographers at American Can plants near Regency, including the one at Hudson being closed down, and had repeatedly asserted a claim to represent lithographers at Regency, on the theory that the lithography department at Regency was nothing more than a continuation of operations previously performed by the lithographic unit at Hudson, which ALA represented. Although this claim was ultimately rejected by the Board, see above, it was hardly a frivolous one, see note 3 supra, and raised a question concerning representation the resolution of which was for the Board, not the Company. Had the Board been apprised of the facts by the Company, the Board might well have determined that a separate lithography unit at Regency was appropriate, and might have given the lithographers there a choice between the Steelworkers and ALA, as the Board now seeks to do.[9]
 
 
 27
 But the Company did not choose to disclose ALA's demands to the Board or seek to limit the unit, at least for a while, by excluding the lithographers. Instead, it recognized the Steelworkers at Regency for a unit that included lithographers although it knew of ALA's interest both before the election and before signing a contract with the Steelworkers. Furthermore, against the background of the Company's expressed desire to have only one union at the new plant, its officer Ries gave a Board agent what was at best a less than candid answer when asked if he personally knew of any interest on behalf of ALA in the election. The Board itself may have been negligent both before and after the election, first, in not following up on Ries's suggestion to contact Company headquarters and, then, in certifying the Steelworkers without any inquiry after ALA filed its first unfair labor practice charge.[10] But such negligence on the part of the Board should not defeat the rights of the lithographic employees to a fair chance to select their bargaining representative. Although the form of this proceeding pits the Board against the Company and the two unions against each other, the principal rights at issue are those of the Regency lithographers. Administrative bungling by the Board's Regional Office cannot justify perpetrating an unfair labor practice on the lithographers, especially when those who benefited from the bungling encouraged it.[11]
 
 
 28
 Under these circumstances, we believe that there was substantial evidence to support the Board's finding that there was a real question concerning representation at the time the Company recognized the Steelworkers. Under Midwest Piping, the Company could not, on these facts, unilaterally resolve questions concerning representation of the lithographers at Regency, who had not yet even been hired. Recognition of the Steelworkers as their bargaining agent violated sections 8(a)(2) and (1) of the Act and application of the Steelworkers' union security clause to Regency lithographers violated sections 8(a)(1), (2) and (3). The Company claims that it could not have committed an unfair labor practice in recognizing the Steelworkers because that union was certified after an election properly held under the General Extrusion doctrine, which allows an election at a new plant when employees already working represent at least 30 per cent of those anticipated in 50 per cent of the job classifications.[12] But this begs the question. Since a real question concerning the representation of the lithographic workers existed, they could not be accreted to the larger unit under General Extrusion until that question was resolved. Cf. Captive Plastics, Inc., 209 N.L.R.B. 749 (1974); Airmatics Systems Division of Mosler Safe Co., 209 N.L.R.B. 71 (1974).
 
 
 29
 We do not intend, by our decision in this case, to indicate an indiscriminate approval of the Board's application of the Midwest Piping principle.[13] We hold only that on these particular facts, the Board's finding of a real question concerning representation was supported by substantial evidence, and we therefore enforce its order. This result is not unfair to the Company since the legal disadvantage it now suffers was, to a large extent, self-inflicted. Moreover, the monetary effect of the Board's order is minimal, since no back pay is involved.
 
 
 30
 We deny both petitions to review and we enforce the Board's order.
 
 VAN GRAAFEILAND, Circuit Judge (dissenting):
 
 31
 On August 22, 1973, the United Steelworkers filed a petition with the Regional Office of the NLRB seeking an election at the new Regency plant of the American Can Company. Because a representative number of the anticipated employee complement at Regency had already been employed,[1] American Can and the Steelworkers executed a Stipulation for Certification Upon Consent election agreement. The stipulated unit included "all production and maintenance employees" and did not exclude lithographers.[2]
 
 
 32
 The Board conducted the election on September 21, 1973, and the Steelworkers won, 84 to 0. On October 1, 1973, the Regional Office certified the Steelworkers as the representative of all the production and maintenance employees at the Regency plant. American Can and the Steelworkers have a nationwide collective bargaining contract which provides that all new plants organized by the Steelworkers are automatically covered under the master agreement. After the Steelworkers were certified by the Board as the collective bargaining representative at Regency, the master contract was applied to that plant.
 
 
 33
 The Board, relying on the doctrine of Midwest Piping and Supply Co., 63 N.L.R.B. 1060 (1945), held that, in contracting with the Steelworkers, American Can unlawfully assisted that union in violation of §§ 8(a)(1) and 8(a)(2) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1), (2). My brothers feel that this does not create a new and broadly significant precedent. I cannot agree.
 
 
 34
 The majority say that the Midwest Piping doctrine, briefly summarized, requires an employer to withhold recognition when a real question concerning representation exists. This summary, I fear, is too brief. Under the Midwest Piping rule, an employer faced with claims from rival unions which give rise to a real question concerning representation may not recognize or enter into a contract with one of the unions "until its right to be recognized has finally been determined under the special procedures provided in the Act", Novak Logging Co., 119 N.L.R.B. 1573, 1574 (1958), i. e., "unless and until the question concerning representation has been settled by the Board." Shea Chemical Corp., 121 N.L.R.B. 1027, 1029 (1958).[3]
 
 
 35
 In this case, the question concerning representation had been settled by the Board prior to the application of the Steelworkers' contract to the Regency plant. The Steelworkers had won the Board election and had been certified. Although the Board, upon motion of the General Counsel, subsequently amended the certification issued to the Steelworkers so as to exclude lithographic production employees, this was done in the order on appeal, and thus long after application of the contract between the employer and the Steelworkers had been agreed upon.
 
 
 36
 The Board has the clear power and discretion to determine the number and boundaries of appropriate bargaining units. UAW v. NLRB, 231 F.2d 237, 243 (7th Cir.), cert. denied, 352 U.S. 908, 77 S.Ct. 146, 1 L.Ed.2d 117 (1956); NLRB v. Pittsburgh Plate Glass Co., 270 F.2d 167, 173 (4th Cir. 1959), cert. denied, 361 U.S. 943, 80 S.Ct. 407, 4 L.Ed.2d 363 (1960).[4] This power was exercised in the instant case, and a bargaining unit was certified which included "all hourly rate production and maintenance employees employed by the employer at its Regency plant located on Pierson Avenue, Edison, N.J., but excluding office clerical employees, professional employees, confidential employees, managerial employees, watchmen, guards and supervisors as defined in the Act." If this unit did not include lithographers, it is difficult to understand why the Board found it necessary to amend the certification so as to exclude them. A simple finding by the Board that they were not included would have been sufficient.[5]
 
 
 37
 Instead of holding that lithographers were not included within the certified unit, the Board held that they would not have been included had it been informed of ALA's interest and claim. This, in my opinion, is the crux of the order sought to be enforced. Moreover, it is on this point that I find the Board's determination to be completely without support in the record, since it is undisputed that the Board had knowledge of ALA's claim prior to both the election and the certification. On the day preceding the election, an ALA representative hand delivered a letter to the Board's Regional Office stating that ALA had an interest in the lithographers, and, on September 28, three days prior to the certification of the Steelworkers, an unfair labor charge was filed with the Board in which ALA specifically claimed that it was the "rightful collective bargaining representative" of the Regency lithographers.
 
 
 38
 I cannot concur with the majority in approving the Board's efforts to make Mr. Ries the "fall guy" for the Board's decision. The Board found that when one of its representatives telephoned Mr. Ries to ask if he knew of any interest which ALA had in the election, Mr. Ries "answered in the negative". The testimony referred to is set forth in the margin;[6] and, in fairness to Mr. Ries, I do not believe the Board's summary of this testimony completely and accurately represents what he said.[7]
 
 
 39
 Moreover, it is not at all clear to me what the Board representative meant by the word "interest". Thirty percent has long been the Board's magic figure for establishing a prima facie showing of interest with respect to the duty to bargain. Linden Lumber Division v. NLRB, 419 U.S. 301, 309, 95 S.Ct. 429, 434, 42 L.Ed.2d 465, 471 (1974); NLRB v. J. I. Case Co., 201 F.2d 597, 598 (9th Cir. 1953); N.L.R.B. Statements of Procedure, § 101.18. Accordingly, the Board has held that a proposed intervenor who wishes to represent a different unit than the one petitioned for is required to make a thirty percent showing in the unit it seeks to represent. Southern Radio & Television Equipment Co., 107 N.L.R.B. 216, 217 (1953). While the Board holds that a showing of interest is an administrative matter not tied to percentages, Beneke Corp., 109 N.L.R.B. 1191 (1954), Mr. Ries should not have been expected to concede ALA any interest in the election where it had no contractual interest, where no ALA members were employed at Regency, and where the likelihood of future employment was, at best, conjectural. Heating and Cooling Contractors Ass'n, 115 N.L.R.B. 386 (1956).
 
 
 40
 The decision of the Board can be summed up in the language of its Fortieth Annual Report where, in reviewing the case at page 94, it said that "the mere expressed interest of one union in representing its unit people at a new plant was enough to raise the question concerning representation and thus preclude the employer from entering into a collective-bargaining agreement with another union covering the employees formerly represented by the first union at the old plant, even though the other union had just been certified by the Board as the collective-bargaining agent for all of the employees at the new plant." This, in my view, carries the concept of "real question concerning representation" far beyond any prior decision on this point and is, indeed, a major expansion of the Midwest Piping doctrine.[8] As counsel for the employer has aptly pointed out, neither ALA nor the Board has cited a single case in which a real question concerning representation was found and judicially upheld where no person claimed to be represented was actually employed at the time.
 
 
 41
 It is unfortunate that the decision herein is reached by casting stones at Mr. Ries, because I cannot believe that he, or anyone else employed at American Can, was required to anticipate the Board's decision and conclude that ALA had an interest in the election at Regency when it represented no one employed there. This case will be relied upon by the Board, not because of the role played by Mr. Ries, but as authority for the proposition that an "expressed interest" by a union is sufficient to create a real question concerning representation.
 
 
 42
 The majority's solicitude for the lithographers is one which I share. However, the Midwest Piping doctrine, although commonly justified in terms of "free choice" and "coercion", is really designed as a sort of Marquis of Queensbury rule for competing unions. See Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Har.L.Rev. 38, 119 (1964). ALA has not shown an entitlement to the benefit of such rule in this case. On September 20, the same Board representative who talked to Mr. Ries also called the ALA office and asked it to provide the Board with a showing of interest. ALA did nothing but, instead, permitted the Board to proceed with the election. In so far as the lithographers are concerned, if they are dissatisfied with the Steelworkers, they may opt out of the certified unit by a severance petition and election. NLRB v. Appleton Electric Co., 296 F.2d 202, 206 (7th Cir. 1961); Mallinckrodt Chemical Works, 162 N.L.R.B. 387 (1966). The Board's order, which accomplishes this result by finding the employer guilty of an unfair labor practice, is, in my opinion, arbitrary, unwarranted and without any substantial support in the record. Universal Camera Corp. v. NLRB, 340 U.S. 471, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 43
 I would refuse to enforce that portion of the order.
 
 
 
 [1]
 The same contract included lithographers at two other company plants in New Jersey
 
 
 [2]
 The petition sought a unit of "all production and maintenance employees including lithographers." The last two words were not included in the later description of the unit in the stipulation for a consent election. The parties make much of the deletion. We do not regard it as very significant
 
 
 [3]
 There was evidence that, e. g., the job functions of the lithographers at Regency were similar to those at Hudson; the lithographic equipment and department supervisors at Regency all came from Hudson; the lithographic process is essentially the same regardless of the type of container being manufactured
 
 
 [4]
 This distinguishes such cases as Cooper Thermometer Co. v. NLRB, 376 F.2d 684 (2d Cir. 1967), upon which ALA relies, where this court, having found a refusal to bargain, found it necessary to consider whether a majority of employees at the old plant would have transferred to the new
 
 
 [5]
 See, e.g., Playskool, Inc. v. NLRB, 477 F.2d 66 (7th Cir. 1973); NLRB v. Peter Paul, Inc., 467 F.2d 700 (9th Cir. 1972); Modine Mfg. Co. v. NLRB, 453 F.2d 292 (8th Cir. 1971); American Bread Co. v. NLRB, 411 F.2d 147, 155 (6th Cir. 1969); NLRB v. Air Master Corp., 339 F.2d 553 (3d Cir. 1964); NLRB v. North Electric Co., 296 F.2d 137 (6th Cir. 1961). But cf. Oil Transport Co. v. NLRB, 440 F.2d 664 (5th Cir. 1971); NLRB v. Signal Oil & Gas Co., 303 F.2d 785 (5th Cir. 1962)
 
 
 [6]
 We cited NLRB v. Midtown Service Co., 425 F.2d 665 (2d Cir. 1970); Welch Scientific Co. v. NLRB, 340 F.2d 199 (2d Cir. 1965); and NLRB v. National Container Corp., 211 F.2d 525 (2d Cir. 1954)
 
 
 [7]
 We, of course, express no view as to the correctness of those cases, nor do we imply any approval of the Board's practice of adhering to its position after it has been rejected by several courts of appeals. See Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change 138-43 (1975)
 
 
 [8]
 Even in the cases cited in note 5 supra, it is frequently recognized that whether there is a real question concerning representation must turn on the particular facts of each case. See, e. g., American Bread Co. v. NLRB, 411 F.2d at 155; NLRB v. North Electric Co., 296 F.2d at 139. See also Iowa Beef Packers, Inc. v. NLRB, 331 F.2d 176 (8th Cir. 1964)
 
 
 [9]
 ALA's filing of unfair labor practice charges on September 28 was not the equivalent of the Company's apprising the Board of the facts regarding that claim before the election. The charge only alleges in conclusory fashion that the Company "wrongfully rendered aid and assistance" to the Steelworkers in becoming the representative of the lithographers at Regency, whose "rightful collective bargaining representative" was ALA, without stating the factual basis for the claim. While the Board may have been negligent in not inquiring further into the charge before certifying the Steelworkers, see note 10 infra and accompanying text, we cannot assume that the Board would have been equally negligent had the facts been called to its attention more fully, at an earlier time, and specifically in connection with the representation proceeding (particularly in view of the administrative distinction between complaint and representation cases). We thus cannot say that the Board was wrong in concluding, 218 N.L.R.B. No. 17, at 7, that
 if (the Company) had reported ALA's interest and claim, as it was dutybound to do, 6 no election would have been held and no certification would have issued until the unit placement of lithographic production employees at the Regency plant had been resolved.
 
 
 [6]
 U. S. Chaircraft, Inc., 132 NLRB 922 (1961)
 
 
 [10]
 Certification of the Steelworkers after their victory in the election did not follow automatically as a ministerial act, and the Board could have delayed certification until the unfair labor practice charges were disposed of. Worthington Pump and Machinery Corp., 99 N.L.R.B. 189, 190 (1952)
 
 
 [11]
 The Steelworkers also concede that they "may have been motivated by a determination to steal a jump on the ALA in organizing the Regency plant." Steelworkers' Brief, at 24
 
 
 [12]
 The reference is to General Extrusion Co., 121 N.L.R.B. 1165 (1958), and its progeny
 
 
 [13]
 For general discussion of the Board's approach to the Midwest Piping problem, see Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 117-23 (1964); Getman, The Midwest Piping Doctrine: An Example of the Need for Reappraisal of Labor Board Dogma, 31 U.Chi.L.Rev. 292 (1964); Note, The Employer's Duty of Neutrality in the Rival Union Situation: Administrative and Judicial Application of the Midwest Piping Doctrine, 111 U.Pa.L.Rev. 930 (1963)
 Our dissenting brother quotes the Board's Fortieth Annual Report to support his concern that the Board will use our decision here as authority for the proposition that an "expressed interest" by a union is sufficient to create a real question concerning representation --- F.2d at --- infra. In view of our emphasis on the particular and unusual facts of this case, our decision should not be read that expansively.
 
 
 [1]
 The Board customarily holds that there is a proper employee representation where 30% of the projected work force has been employed and 50% of the job classifications are in existence. General Extrusion Co., 121 N.L.R.B. 1165 (1958); Arvey Corporation, 122 N.L.R.B. 1640 (1959)
 
 
 [2]
 The petition filed by the Steelworkers specifically included lithographers in the proposed unit of production and maintenance employees
 
 
 [3]
 The courts generally have been more liberal than the Board in not requiring that an election precede recognition where there has been a clear demonstration of majority support for the recognized union. Playskool, Inc. v. NLRB, 477 F.2d 66, 70 (7th Cir. 1973). However, this Court has specifically approved the Midwest Piping principle on a number of occasions. See, e. g. NLRB v. Hudson Berlind Corp., 494 F.2d 1200, 1202 (2d Cir., cert. denied, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); NLRB v. Midtown Service Co., 425 F.2d 665 (2d Cir. 1970)
 
 
 [4]
 Lithographers are not necessarily entitled to be treated as a separate unit for purposes of collective bargaining. Continental Can Co., 171 N.L.R.B. 798 (1968). Indeed, the Board has certified an overall production and maintenance unit including lithographers at eight separate plants of the employer American Can Company
 
 
 [5]
 I find inapplicable the majority's discussion of accretion. Where employees fall into classifications already included within a unit and work within and are an integral part of such unit, they are included in the unit. Gillette Motor Transport, Inc., 137 N.L.R.B. 471 (1962). To prohibit the inclusion of employees in an appropriate unit, before a question of representation has been raised, is to refashion the statutory scheme. NLRB v. Appleton Electric Co., 296 F.2d 202, 206 (7th Cir. 1961)
 
 
 [6]
 Q. Mr. Ries, do you recall receiving a phone conversation from Mrs. Phyllis Schectman the day before the election?
 A. Yes.
 Q. What did she say to you, what did you say to her?
 A. She told me that she had just received a letter from the ALA, and she asked me if I personally knew of any interest on behalf of the ALA in the election, and I said, "No."
 Q. What did she say?
 A. And I said that any of these transactions were handled by our Greenwich people, and I suggested she call Greenwich. She said, "Thank you very much," and that was it.
 Q. Do you know whether she did call Greenwich?
 A. I don't know.
 (A 279-80).
 
 
 [7]
 The proof shows that Lester Cooper, the employer's attorney in Greenwich, had been representing the company in its dealing with the Board, not Mr. Ries, who was the supervisor of employee relations at the company's Hudson plant
 
 
 [8]
 It may safely be predicted that, from this time forward, every employer who closes a plant and relocates will be met with a demand for continued recognition by each of his existing unions which will, under the Board's interpretation of Midwest Piping, prevent recognition of another union at the new plant without a prior election, regardless of the strength of that union's representation. Although this may comply with the Board's desire for increased use of its election procedures, it is hardly conducive of tranquility and order in the relationship between management and labor